UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

_____

|  |  |  |
|---|---|---|
| ZOETIS SERVICES, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 22-00056 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____

### <u>ORDER</u>

Upon considering defendant's cross-motion for summary judgment in the above-captioned action; and upon consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that defendant's cross-motion for summary judgment is granted;

**ORDERED** that plaintiff's motion for summary judgment is denied; and it is further

**ORDERED** that judgment is entered in favor of defendant.


Dated: _____                        _____
     New York, New York                                              Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

_____
                                              :
ZOETIS SERVICES, LLC,                         :
                                              :
                        Plaintiff,            :
                                              :
            v.                                :        Court No. 22-00056
                                              :
UNITED STATES,                                :
                                              :
                        Defendant.            :
_____   :

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

AIMEE LEE
Assistant Director

*Of counsel*:                          LUKE MATHERS
MICHAEL A. ANDERSON                     Trial Attorney
Office of the Assistant Chief Counsel  Department of Justice, Civil Division
International Trade Litigation          Commercial Litigation Branch
U.S. Customs and Border Protection     26 Federal Plaza – Suite 346
                                       New York, New York 10278
                                       (212) 264-9236
Dated: June 30, 2025                   *Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 3

    I.    Antibiotic Feed Additives ............................................................................... 3

    II.    Zoetis's Feed-Grade Chlortetracycline Concentrate ...................................... 7

        A.    Physical Characteristics ........................................................................ 7

        B.    Post-Importation Use and Marketing.................................................... 9

        C.    Post-Importation Distribution ............................................................. 11

    III.    Injectable Antibiotics ................................................................................... 12

    IV.    Procedural History ....................................................................................... 13

QUESTION PRESENTED................................................................................................ 14

SUMMARY OF ARGUMENT ........................................................................................ 14

ARGUMENT ................................................................................................................... 15

    I.    Standard of Review ...................................................................................... 15

    II.    Zoetis's Feed-Grade Chlortetracycline Concentrate is a "Preparation[] of a Kind Used in Animal Feeding" of Heading 2309 ........................................................... 17

        A.    Explanatory Note 23.09 Clarifies that Zoetis's Feed-Grade Antibiotic Product is Itself a Class or Kind of Goods Covered by Heading 2309, Obviating the Need for Further Analysis ....................................................................................... 17

        B.    Regardless, the *Carborundum* Factors Mandate Classification Under Heading 2309 . 21

            1.    General Physical Characteristics.................................................... 22

            2.    Expectations of Ultimate Purchasers ............................................ 23

            3.    Channels of Trade ......................................................................... 25

            4.    Environment of Sale ...................................................................... 25

            5.    Use in the Same Manner as Merchandise which Defines the Class ........................ 26

            6.    Economic Practicality ................................................................... 27

7.    Recognition in Trade ................................................................................... 27

C.    Note 1 to Chapter 23 Does Not Exclude Zoetis's Merchandise ................................... 28

III.    Zoetis's Feed-Grade Chlortetracycline Concentrate is Not a "Medicament[] …
Consisting of Two or More Constituents Which Have Been Mixed Together for Therapeutic or
Prophylactic Uses" of Heading 3003 .......................................................................... 30

A.    Zoetis's Merchandise is Just One Constituent, Not "Two or More Constituents Which
Have Been Mixed Together" as Heading 3003 Requires and Explanatory Note 30.03
Clarifies .................................................................................................................... 30

B.    Even if Zoetis's Merchandise Consisted of More Than One Constituent—Which it
Does Not—the *Carborundum* Factors Confirm that the Merchandise Does Not Fall Under
Heading 3003 ............................................................................................................... 32

IV.    Note 1 to Chapter 29 and Explanatory Note 29.41 Preclude the Merchandise's
Classification Under Heading 2941 as an Antibiotic ................................................ 34

CONCLUSION ................................................................................................................ 38

## **TABLE OF AUTHORITIES**

**Cases**

*ADC Telecomms., Inc. v. United States,*
  916 F.3d 1013 (Fed. Cir. 2019) ................................................................................ 16

*Alcan Food Packaging (Shelbyville) v. United States,*
  929 F. Supp. 2d 1338 (Ct. Int'l Trade 2013) .................................................... 29, 34

*Aromont USA, Inc. v. United States,*
  671 F.3d 1310 (Fed. Cir. 2012) ................................................................................ 18

*Burgess v. United States,*
  553 U.S. 124 (2008) ................................................................................................. 29

*Degussa Corp. v. United States,*
  508 F.3d 1044 (Fed. Cir. 2007) ................................................................................ 18

*Dependable Packaging Sols., Inc. v. United States,*
  757 F.3d 1374 (Fed. Cir. 2014) ................................................................. 21, 22, 32

*Drygel, Inc. v. United States,*
  541 F.3d 1129 (Fed. Cir. 2008) ................................................................................ 17

*Franklin v. United States,*
  289 F.3d 753 (Fed. Cir. 2002) ................................................................................. 20

*Govesan Am. Corp. v. United States,*
  167 F. Supp. 2d 1374 (Ct. Int'l Trade 2001) .......................................................... 20

*H. Reisman Corp. v. United States,*
  17 C.I.T. 1260 (1993) ........................................................................ 27, 31, 33, 36

*In Zone Brands, Inc. v. United States,*
  456 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) .......................................................... 18

*Jarvis Clark Co. v. United States,*
  733 F.2d 873 (Fed. Cir. 1984) ................................................................................. 37

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ................................................................................................. 36

*Micro Chem., Inc. v. Lextron, Inc.,*
  318 F.3d 1119 (Fed. Cir. 2003) ........................................................................... 3, 22

*Minnetonka Brands, Inc. v. United States,*
  110 F. Supp. 2d 1020 (Ct. Int'l Trade 2000) .......................................................... 21

*Nutricia N. Am., Inc. v. United States,*
  666 F. Supp. 3d 1363 (Ct. Int'l Trade 2023)..............................................30

*Orlando Food Corp. v. United States,*
  140 F.3d 1437 (Fed. Cir. 1998) ................................................................17, 33

*Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
  42 F.4th 67 (2d Cir. 2022) ..........................................................................29

*Primal Lite, Inc. v. United States,*
  182 F.3d 1362 (Fed. Cir. 1999) ..................................................................18

*RKW Klerks Inc. v. United States,*
  94 F.4th 1374 (Fed. Cir. 2024) ..................................................................16

*Rocknel Fastener, Inc. v. United States,*
  267 F.3d 1354 (Fed. Cir. 2001) ..................................................................16

*StoreWALL, LLC v. United States,*
  644 F.3d 1358 (Fed. Cir. 2011) ..................................................................17

*United States v. Carborundum Co.,*
  536 F.2d 373 (C.C.P.A. 1976)..............................................................*passim*

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ....................................................................................36

*Warner-Lambert Co. v. United States,*
  407 F.3d 1207 (Fed. Cir. 2005) ............................................................21, 34

**Statutes**

28 U.S.C. § 2640(a)(1)........................................................................................37

28 U.S.C. § 2643(b) ............................................................................................37

**Harmonized Tariff Schedule of the United States**

Rules of Interpretation:

  General Rule of Interpretation 1............................................16, 17, 32, 34

  General Rule of Interpretation 3(a) ..............................................32, 34

  General Rule of Interpretation 6....................................................17

  Additional Rule of Interpretation 1 ..........................................17, 18, 32

Chapter 23:

Note 1 to Chapter 23 ................................................................................ 28, 29

Heading 2309 ........................................................................................... *passim*

Subheading 2309.90 ............................................................................ 28

Subheading 2309.90.10 ...................................................................... 13

Subheading 2309.90.70 ...................................................................... 28

Subheading 2309.90.95 ...................................................................... 28

Chapter 29:

Note 1 to Chapter 29 ................................................................................ 35, 36

Heading 2941 ........................................................................................... *passim*

Chapter 30:

Heading 3003 ........................................................................................... *passim*

Chapter 99:

Subheading 9903.88.03 ........................................................................... 13

**Regulations**

19 C.F.R. § 177.7(b) ...................................................................................... 37

21 C.F.R. § 558.3(b) ...................................................................................... 6

**Rules**

USCIT Rule 56 .................................................................................................. 1

USCIT Rule 56(a) ............................................................................................ 15

**Other Authorities**

Allen I. White, Ph.D.,
 *Antibiotics*, in *Textbook of Organic Medicinal and Pharmaceutical Chemistry*
 (6th ed. 1971) .......................................................................................... 13

Association of American Feed Control Officials,
 *Feed Inspector's Manual* (8th ed. 2020) ......................................... 5, 6, 28

Association of American Feed Control Officials,
*Feed Terms and Definitions*, *Official Publication* (2024) ................................... 7, 22

Explanatory Note 23.09 ........................................................................... *passim*

Explanatory Note 29.41 ........................................................................... *passim*

Explanatory Note 30.03 ........................................................... 2, 30, 31, 33

General Explanatory Note to Chapter 29 ................................................ 35

HQ 083437 (Mar. 13, 1990) ..................................................................... 23

HQ 086477 (Mar. 26, 1990) ..................................................................... 23

HQ H325604 (Aug. 31, 2023) ............................................................. 36, 37

J.I.R. Castanon, *History of the Use of Antibiotic as Growth Promoters in European Poultry Feeds*, 86 Poultry Sci. 2466 (2007) [perma.cc/SDT4-QHG8] .................................. 19

Jinhe Biotechnology Co., Ltd., *Chlortetracycline Feed Grade (Powder/Granule)*,
http://www.jinhe.com/en/product/Index/133 [perma.cc/C3SR-9KL2?type=image] ................ 26

Madhab K. Chattopadhyay,
*Use of Antibiotics as Feed Additives: A Burning Question*,
5 Frontiers in Microbiology (July 2014) .................................................... 3, 4, 5, 22

Mark S. Ash,
U.S. Dep't of Agric., *Animal Feeds Compendium* (May 1992) ........................................ *passim*

*Mycelium*, Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/mycelium [perma.cc/GUW4-EGNJ] ............... 19

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

_____
                                       :
ZOETIS SERVICES, LLC,                  :
                                       :
                    Plaintiff,         :
                                       :
            v.                         :        Court No. 22-00056
                                       :
UNITED STATES,                         :
                                       :
                    Defendant.         :
_____:

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the United States Court of International Trade (USCIT),

defendant, the United States (the Government), responds to plaintiff's motion for summary

judgment and respectfully cross-moves for summary judgment.

**INTRODUCTION**

Since the 1940s, farmers have used antibiotic products in raising livestock.  Some

products are directly administered to individual animals in a high concentration through injection

to treat bacterial disease.  Other products are mixed into a herd's feed in a lower concentration—

grams of product per ton of feed—to not only treat disease but also to maintain animals' growth.

The former products are known as injectable antibiotics or antimicrobials.  They are put up in

vials, are higher concentration, are used therapeutically, and move through medical channels of

trade.  The latter products are part of larger class of "feed additives" containing

"microingredients"—special ingredients like vitamins, hormones, and antibiotics that are mixed

into animal feed in small amounts.  Unlike injectable antibiotics, feed additives are sold in bulk,

incorporated into feed in low concentrations, are used not just therapeutically but also to help

maintain animals' growth, and move through agricultural channels of trade.

Plaintiff Zoetis Services, LLC imports feed-grade chlortetracycline concentrate that, after importation, it mixes with other products to create antibiotic feed additives. Given its sole use in feed additives, its distinctions from injectable antibiotics, and its movement through agricultural channels of trade (among other facts relevant in the *Carborundum* analysis), Zoetis's feed-grade chlortetracycline concentrate belongs to the class or kind of "[p]reparations … used in animal feeding" described in heading 2309 of the Harmonized Tariff Schedule of the United States (HTSUS). Explanatory note 23.09 confirms as much—it specifies that an antibiotic product virtually indistinguishable from Zoetis's imported merchandise falls under heading 2309.

Zoetis suggests that its feed-grade merchandise should instead be considered a "[m]edicament[] … consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses," heading 3003, HTSUS, or an "[a]ntibiotic[]" of heading 2941, HTSUS. But the merchandise does not meet heading 3003's description because, as imported, it is just *one* constituent that is only later mixed with other constituents for treating and preventing disease. The merchandise as a whole is an active pharmaceutical ingredient (API), yet as explanatory note 30.03 confirms, a medicament with "two or more constituents" contains not just a single API but also an excipient (or two or more APIs). Regardless, a *Carborundum* analysis favors classification under heading 2309 with other feed additives and microingredients, precluding classification under heading 3003. Nor can the merchandise be classified as an antibiotic under heading 2941, because explanatory note 29.41 clarifies that antibiotic preparations for use in animal feeding are excluded from the heading. As such, only heading 2309 describes Zoetis's merchandise, as Customs determined.

The Court should accordingly grant the Government's cross-motion for summary judgment, deny Zoetis's motion, and grant judgment in the Government's favor.

## **BACKGROUND**

### I.    **Antibiotic Feed Additives**

"Antibiotics are chemotherapeutic agents used for the clinical management of infectious diseases in humans, plants and animals.  However, a sizeable fraction of antibiotics produced every year all over the world is used for non-therapeutic purposes" in animal feed.  Gov't Ex. 1, Madhab K. Chattopadhyay, *Use of Antibiotics as Feed Additives: A Burning Question*, 5 Frontiers in Microbiology at 1 (July 2014).

Antibiotics are included in animal feed through non-nutritive "feed additives."  A feed additive is an "ingredient or combination of ingredients added to the basic feed mix or feed supplement to fulfill a specific need," and "[u]sually" is "used in micro quantities" and "requires careful handling and mixing."  Gov't Ex. 2, Mark S. Ash, U.S. Dep't of Agric., *Animal Feeds Compendium* at 151 (May 1992).  "Feed additives frequently come in a premix form."  *Id.* at 114.  A "[p]remix" is a "uniform mixture of one or more microingredients"—"[v]itamins, minerals, antibiotics, drugs, and other materials normally required in small amounts and measured in milligrams, micrograms, or parts per million (ppm)"—combined "with diluent and/or carrier" and "used to facilitate uniform dispersion of the microingredients in a larger mix."  *Id.* at 156.  Feed "[f]ormulators include feed additives in trace amounts to counteract illness, promote growth, or improve the physical and sensory characteristics of the primary feed ingredients."  *Id.* at vii; *see Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1121 (Fed. Cir. 2003) ("Animal feedlots generally add microingredients to livestock and poultry feed. Microingredients are feed additives, such as vitamins, antibiotics, hormones, medicines, and

nutritional supplements, that provide a balanced diet, stimulate growth, and protect the animals from disease." (emphasis omitted)).

"The ability of low doses" of "antibiotics to promote growth of animals and birds was discovered" by accident "in the 1940s." *Use of Antibiotics as Feed Additives* at 1. Since then, this discovery has been "widely exploited" such that the "addition of antibiotics to … animal feed to stimulate growth has turned into a global practice." *Id.* Indeed, livestock that eat animal feed supplemented with "antibiotics used as a feed additive" require "less feed to achieve a desired level of growth" (thus saving on expensive feed costs), more efficiently convert "feed to animal product and improvement," produce "better quality" meat with more protein and less fat, are healthier, and, in the case of poultry, produce more eggs. *Id.*

"The basis of [the] growth-promoting effect of antibiotics is not clearly known." *Id.* It may be because antibiotics added to feed fend off microorganisms that "consume a considerable portion of nutrients in the feed." *Id.* Or antibiotic feed additives might reduce stress on animals' immune systems, relieving them "of the need to produce cytokines," which eventually "cause wastage of the muscles," in response to "latent infections." *Id.* Either way, "there is no doubt about the important role of antibiotics in profitable and efficient production of livestock." *Id.*; *Animal Feeds Compendium* at 128 ("Farmers' per-unit costs are lower as their animals need less feed per pound of gain, reach maturity faster, transport better, require fewer veterinary visits, and have lower mortality rates. Profits are higher for livestock producers and retail prices are lower to consumers of meat.").

The use of antibiotics in animal feed, however, appears to have promoted the "emergence of antibiotic-resistant strains" of bacteria. *Use of Antibiotics as Feed Additives* at 1. There is some debate as to the extent of antibiotic feed additives' role in that trend. *See id.* at 2.

Regardless, the federal Food and Drug Administration has since at least 2012 "recommended use of antibiotics only for the prevention, control and treatment of infections in animals[,] but not for the promotion of growth, increased performance, and improved feed efficiency." *Id.* And in guidance published in 2013 and finalized in 2017, the FDA advised manufacturers "to relabel their products voluntarily in order to make people aware of its disapproval [of] the use of antibiotics as growth-promoters in animals. The label should also indicate that the use of antibiotics in animals must be supervised by a veterinarian." *Id.* at 3. But this FDA guidance does not apply to certain antibiotics that are not used in humans (such as "ionophores") and can thus still be used "in animals as growth-promoters." *Id.*; *see* Pl.'s Ex. 3, FDA, Center for Veterinary Medicine, *Guidance for Industry #213*.

Currently, veterinary oversight of antibiotic feed additives is achieved through a "veterinary feed directive," or VFD. "The VFD is a written statement issued by a veterinarian authorizing a client (animal producer) to obtain and use a VFD drug to treat their animals." Gov't Ex. 3, Association of American Feed Control Officials, *Feed Inspector's Manual* at 91 (8th ed. 2020). The FDA's Center for Veterinary Medicine developed the "VFD concept as a means to reduce unnecessary use of certain antimicrobial drugs in animals and to slow or prevent the potential increase of bacterial resistance to antimicrobial drugs." *Id.* "Under the VFD process, an appropriately licensed veterinarian, operating within the confines of a valid veterinarian-client-patient relationship, examines and diagnoses animal conditions and determines whether a condition warrants use of a VFD drug [*i.e.*, a Type A Medicated Article]. If it does, the veterinarian will issue a signed VFD containing information specified by regulation." *Id.* With a signed VFD, an animal producer can obtain "VFD medicated feed" from a feed "distributor" or retailer. *Id.* at 93.

5

The following chart (*id.* at 95) depicts the typical distribution chain for animal feeds containing antibiotic feed additives added pursuant to a VFD:



("Type A VFD Drug" is synonymous with "Type A Medicated Article"; "Type B/C VFD Medicated Feed" is synonymous with "Type B" and "Type C Medicated Feed." *See* 21 C.F.R. § 558.3(b)(2) and (3).)

As the chart notes, veterinarians work directly with animal producers when it comes to animal feeds that require VFDs.  Requests for custom feed formulas typically "come in from nutritionists," "producers," and "feed mills."  Gov't Ex. 4, USCIT Rule 30(b)(6) Deposition of Kevin Schluender of NutraBlend, LLC (Schluender Dep.) at 36:20–37:2.  Veterinarians issuing VFDs "are participating in these discussions generally behind the scenes" because they are "working directly with the producers of these proteins," *id.*, not with Type A Medicated Article manufacturers or with feed manufacturers, distributors, or retailers.  *See* Gov't Ex. 5, USCIT Rule 30(b)(6) Deposition of Dr. Aubrey Schroeder of Zoetis (Schroeder Dep.) at 27:17–19 ("The time [a VFD] is necessary is when a producer actually takes that Type C Medicated Feed and feeds it to the animal."); *id.* at 29:11 ("So veterinarians are in the process, but only at the end[.]").

## II.    Zoetis's Feed-Grade Chlortetracycline Concentrate

### A.    Physical Characteristics

In this case, the subject merchandise "consists of feed-grade chlortetracycline concentrate" that was "manufactured in China by Jinhe Biotechnology Co., Ltd."  Joint Statement of Undisputed Facts (JSUF) ¶ 5.  "Feed grade" means that the merchandise "has been determined to be safe, functional, and suitable for its intended use in animal food, is handled and labeled appropriately, and conforms to the Federal Food, Drug, and Cosmetic Act … (suitable for use in animal feed)."  Gov't Ex. 6, Association of American Feed Control Officials, *Feed Terms and Definitions*, *Official Publication* at 358 (2024).

The merchandise is "produced through a fermentation biomass process."  JSUF ¶ 8. "Specifically, the bacteria *Streptomyces aureofaciens* is aerobically fermented in an aqueous culture medium—a broth of water and nutrients designed to support the bacteria's growth—

within a fermentation vessel." *Id.* ¶ 9.  Calcium carbonate is included in the fermentation broth specifically to prepare the merchandise for use in animal feed.  Plaintiff's Statement of Material Facts (PSMF) ¶ 18; Schroeder Dep. at 47:5–14 ("[I]t makes it stable so it doesn't degrade when you mix it into feed[.]").  This fermentation "produces chlortetracycline," "a broad-spectrum antibiotic" that is "also known by the trade name Aureomycin."  JSUF ¶¶ 7, 10.

"The chlortetracycline is not extracted from the culture medium." *Id.* ¶ 11.  "Rather, once the desired potency has been reached, the entire contents of the fermentation vessel—the bacterial colony, the chlortetracycline that it produced, and the remaining culture medium—are filtered and dried." *Id.* ¶ 12.  "These dried contents of the fermentation vessel are then sieved and ground to achieve the desired particle size and potency, resulting in" the feed-grade chlortetracycline concentrate that Zoetis imports in 750-kilogram bags. *Id.* ¶¶ 13–14.  As such, the merchandise does not consist solely of chlortetracycline.  It includes "mycelial cake, microbial cells, residual nutrients, other fermentation components, and metabolic products." PSMF ¶ 17.  The antibiotic concentration of the subject feed-grade chlortetracycline concentrate ranges from 21.7 to 23.8 percent.  Gov't Ex. 7, Plaintiff's Amended Interrogatory Responses (Pl.'s Rog. Resps.) at 6.  The remainder of the subject merchandise, chemically speaking, is largely protein. *Id.*, Plaintiff's Interrogatory Responses at 5.

The feed-grade chlortetracycline concentrate "is a fine brown powder or granular substance[.]"  JSUF ¶ 14.  It is important for the product to be "free flowing" so that it can "homogenat[e]" within the mixtures that Zoetis later creates with it, dispersing the antibiotic content evenly throughout, Gov't Ex. 8, USCIT Rule 30(b)(6) Deposition of Josh Tauren of Zoetis (Tauren Dep.) at 14:1–12, 18:2–19:24; PSMF ¶¶ 24-25, as described below.

### B.    Post-Importation Use and Marketing

The merchandise itself is not a Type A Medicated Article; rather, "Zoetis imports the" subject merchandise "as one of the ingredients that ultimately get mixed with other ingredients, such as rice hulls, mineral oil, maybe calcium sulfate, to manufacture a Type A Medicated Article."  Schroeder Dep. at 14:11–21. That Type A Medicated Article is, in turn, incorporated into premixes, then ultimately added to feed.  Specifically, Zoetis adds the API—the subject merchandise—with "the excipient" in a "ribbon mixer" to be mixed "for a defined period." Tauren Dep. at 22:24–23:19; PSMF ¶ 26 (describing the subject merchandise as a "feed grade" "[c]hlortetracycline active pharmaceutical ingredient").   The mixture then "drops from the mixer to the holding hopper."  Tauren Dep. at 23:2–3.  "From there it" first "goes through the compactor," which compacts the mixture "into a sheet or a pencil," then to "a mill" that "grinds the mixture down to a specific particle size."  *Id.* at 22:6–23, 23:3–6.  Afterward, the ground particles are screened to obtain "the right particle size" then packaged "into 50-pound bags."  *Id.* at 23:9–15.  This creates a product with "a standardized and consistent potency of the [chlortetracycline] antibiotic between 8% and 22% for ultimate delivery to livestock."  Pl.'s Rog. Resps. at 18.  Process flow diagrams for these Type A Medicated Articles are contained in Gov't Ex. 9.

The imported merchandise is used to create five different kinds of Type A Medicated Articles:  Aureomycin® 90 Meal, Aureomycin® 50G/90G/100G, Aureomix® S40/40, AUREO S 700®, and ChlorMax® (Zoetis's "CTC Products").  The below chart, derived from Pl.'s Rog. Resps. at 11–16 and JSUF ¶¶ 23–29, summarizes these products' relevant characteristics:

9

| Type A Medicated Article | Chlortetracycline Concentration (in grams/pound) | Chlortetracycline Concentration (as a percentage) | Active Ingredients | Inert Ingredients |
|---|---|---|---|---|
| Aureomycin® 90 Meal | 90 g/lb | 19.8% | Chlortetracycline | Rice hulls, mineral oil |
| Aureomycin® 50G/90G/100G | 50 g/lb, 90 g/lb, or 100 g/lb | 11%, 19.8%, or 22% | Chlortetracycline | Calcium sulfate, mineral oil, water |
| Aureomix® S40/40 | 40 g/lb | 8.8% | Chlortetracycline, Sulfamethazine | Calcium sulfate |
| AUREO S 700® | 35 g/lb | 7.7% | Chlortetracycline, Sulfamethazine | Calcium carbonate, mineral oil, silica gel |
| ChlorMax® | 50 g/lb | 11% | Chlortetracycline | Roughage products (e.g., rice hulls), silicon dioxide, mineral oil |

All these CTC Products are labeled and marketed for the treatment and control of disease in livestock. Pl.'s Rog. Resps. at 11–16. Aureomix® S40/40 and AUREO S 700® are also labeled and marketed for aiding in the "maintenance of weight gains in the presence of" certain diseases. *Id.* at 15. Either way, the subject merchandise contained in the CTC Products "will still have a growth promoting [e]ffect even though it is used at a therapeutic level." Schroeder Dep. at 69:7–18. Indeed, before the FDA's *Guidance for Industry #213* became effective on January 1, 2017, all the CTC Products could be labeled and marketed with livestock "performance claims" like "increasing rate of weight gain and improving feed efficiency." *Id.* at 25:5–15.

Zoetis markets the CTC Products as "feed additives" on its website and in catalogues, alongside other products like "Actogain® 45," "Bovatec®," and "MGA®." Gov't Ex. 10, ZOETIS00421 ("Your success depends on your gains. More average daily gain. Greater gains in feed efficiency and cattle health. Don't be held back by limited feed additive choices. With Zoetis, you gain more choices with the broadest range of feed additives on the market."). Actogain® 45 is a "beta agonist" that "boosts average daily gain" and "improves feed

efficiency"; Bovatec® is an "ionophore" antibiotic "that boosts feed efficiency" and "increases average daily gain without compromising feed intake"; and MGA® is a "feed additive that suppresses heat in feedlot heifers while improving feed efficiency and increasing weight gain." *Id.* These products do not require VFDs. *See id.* And Zoetis has obtained "cross-clearance approvals" to market non-VFD growth-promoting feed additives like Bovatec® and MGA® to be used alongside feed additives like Aureomycin®. Gov't Ex. 11, ZOETIS00276–316.

### C.    Post-Importation Distribution

The CTC Products, consistent with the distribution chart above, "are primarily sold to … feed mills, farmers, and manufacturers of Type B Medicated Feed and Type C Medicated Feed articles, including premix manufacturers like NutraBlend (a subsidiary of Land O'Lakes), for ultimate use in livestock feeds." JSUF ¶ 33. (They typically are not carried by veterinarians, though "some veterinarians," particularly in remote locations, may carry them. Schroeder Dep. at 64:24–65:19.) NutraBlend is "a premix and distribution company" that procures microingredients like vitamins, minerals, "amino acids, medicated feed articles, enzymes, probiotics, prebiotics," and "yeast." Schluender Dep. 14:22–16:15. NutraBlend will either "further dilute" a CTC Product, "simply distribute" it, or "add it to a premix." *Id.* at 33:9–15. In other words, NutraBlend "deliver[s] the groceries," so to speak, that make up the "full meal" that will be delivered by a complete feed producer like Purina. *Id.* at 27:2–22.

The CTC Products are ultimately incorporated into complete feeds in "micro" amounts. Zoetis directs that Aureo S 700®, for instance, be mixed "in the feed to supply 350 mg of Aureomycin chlortetracycline and 350 mg of sulfamethazine per head [of beef cattle] per day." Gov't Ex. 12, ZOETIS00188. This means that the antibiotic as provided to a herd is measured in

grams per ton—anywhere from 35 grams to 1400 grams of antibiotic per ton of "[s]upplement."
*Id.* And that equates to .0039 to .15 percent antibiotic in one ton of supplemental feed.

### III. Injectable Antibiotics

Antibiotics and other drugs used in raising livestock are not only provided to animals in
the form of feed additives. They may also put up as "dosage products" in the form of "oral,"
"implant[able]," "injectable," "ophthalmic," "topical," and "intramammary" preparations. Pl.'s
Ex. 4, ZOETIS00810. These dosage products have different characteristics from feed additives
like the CTC Products.

Antibiotics like Zoetis's Draxxin®, for instance, are administered through injection rather
than through an animal's feed. Having to individually treat animals with a product like
Draxxin® makes it less cost effective in providing antibiotics to a whole herd than simply adding
an antibiotic feed additive to the herd's feed. Schroeder Dep. at 29:18–32:10. They are
accompanied by "prescribing information," Gov't Ex. 13, ZOETIS0007, ZOETIS00068, sold
through veterinary supply companies rather than feed businesses, Schroder Dep. at 63:22–24;
Schluender Dep. at 19:23–25 (NutraBlend does not buy "injectable antibiotics from Zoetis"),
and, if medically important in humans, require a veterinary prescription, Schroeder Dep. at 62:6–
13. Moreover, Zoetis markets its "dosage products" like injectable antibiotics and implantable
medicines separately from its feed additives. *See* Gov't Ex. 13, ZOETIS00003–005 (listing
injectable antibiotic Draxxin® in the "Antimicrobials" section, implantable products in a
"Growth Implants" section, and feeds additives like Actogain® and the CTC Products in the
"Medicated Feed Additives" section of Zoetis's "Beef and Dairy Cattle Products" catalog).

Furthermore, injectable antibiotics are in "pure," "crystallin[e]" form and in "higher
concentration" as administered to an animal than in the case of feed containing a CTC Product.

Schroeder Dep. at 29:18–32:10.  Although all antibiotics are produced through "fermentation during which the antibiotic is formed," crystalline antibiotics are "isolate[ed]" "from the culture media," "purifi[ed]," "test[ed] for sterility," then "formulat[ed] into acceptable and stable dosage forms."  Gov't Ex. 14, Allen I. White, Ph.D., *Antibiotics*, in *Textbook of Organic Medicinal and Pharmaceutical Chemistry* at 346 (6th ed. 1971).  Indeed, an injectable antibiotic like Draxxin® is made by isolating "the Tulathromycin crystal" from everything "non-pure" in the fermentation broth, purifying it, "stabiliz[ing]" it, "and then add[ing]" in "the different excipients that are injected."  Schroeder Dep. at 54:24–55:18.  The production process even requires "clean rooms, clean suiting" and monitoring of "the particulate air" and the "people" involved, "endotoxic testing," and "[s]terility testing."  Tauren Dep. at 24:20–25:12 (agreeing that the production of injectable antibiotics is "a whole different ballgame").

## IV.    Procedural History

Zoetis imported the subject feed-grade chlortetracycline concentrate "in two entries made … on December 26, 2019, and January 22, 2020, at the Port of Chicago, Illinois."  JSUF ¶ 1. "At liquidation, U.S. Customs and Border Protection (Customs) classified all of the subject merchandise under subheading 2309.90.10, HTSUS, a duty-free provision, and assessed Section 301 duties under subheading 9903.88.03, HTSUS, at 25 percent *ad valorem*."  *Id.* ¶ 2.  "Zoetis filed protests contesting Customs' classification of the subject merchandise," arguing that it was a duty-free "[m]edicament[]" of heading 3003 not secondarily classifiable under subheading 9903.88.03, but "Customs denied" these protests.  *Id.* ¶ 3; ECF No. 11.  "Zoetis paid all liquidated duties, taxes, and charges before filing summonses," JSUF ¶ 4, after which Zoetis filed a complaint, ECF No. 4.  Later, Zoetis amended its complaint to add a claim for

classification as an "[a]ntibiotic[]" of heading 2941. ECF No. 24. After the completion of discovery, Zoetis moved for summary judgment. ECF No. 41 (Mot.).

<u>QUESTION PRESENTED</u>

Whether Zoetis's feed-grade chlortetracycline concentrate should be classified as a "[p]reparation[] of a kind used in animal feeding," heading 2309; a "[m]edicament[] … consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses," heading 3003; or an "[a]ntibiotic[]" of heading 2941.

<u>SUMMARY OF ARGUMENT</u>

Zoetis's feed-grade chlortetracycline concentrate is a "[p]reparation[] of a kind used in animal feeding" described in heading 2309. The merchandise meets the plain terms of the heading: at the time of importation, it is a "preparation" that is "used in animal feeding," as it is a substance that has been specially made up to be incorporated into animal feed. Explanatory note 23.09 provides that an antibiotic product virtually indistinguishable from Zoetis's is classifiable under heading 2309, demonstrating that the subject merchandise belongs in the heading under which Customs classified it.

Even if it were necessary to engage in a "principal use" analysis despite the explanatory note's specific inclusion of the merchandise, the seven *Carborundum* factors favor classification under heading 2309. *United States v. Carborundum Co.*, 536 F.2d 373 (C.C.P.A. 1976). Each factor demonstrates that Zoetis's feed-grade chlortetracycline concentrate is fungible with at least one class or kind of goods that heading 2309 describes: microingredients like antibiotics added to animal feed.

The subject merchandise cannot be classified under heading 3003, as Zoetis argues. For one thing, it does not meet the terms of heading 3003: it does not "consist[] of *two or more*

14

*constituents which have been mixed together* ….”  Rather, it consists of just *one* constituent—the merchandise itself is the only API—that is later mixed post-importation with excipients like rice hulls, mineral oil, and calcium sulfate.  As such, the merchandise does not meet the terms of heading 3003.

Regardless, the undisputed facts, analyzed under the *Carborundum* factors, demonstrate that Zoetis's feed-grade chlortetracycline concentrate does not fall within the class or kind of merchandise described by heading 3003.  As explanatory note 23.09 points out, merchandise like Zoetis's is to be distinguished from "certain preparations" that are "for veterinary uses" and "generally identifiable by the medicinal nature," "much higher concentration of the active substance," and "different way" of being "put up."  In other words, the sorts of goods excluded from heading 2309 are "dosage products" like injectable antibiotics, not antibiotics ultimately included in animal feed.

Finally, Zoetis's feed-grade chlortetracycline concentrate cannot be classified under heading 2941 as an "[a]ntibiotic[]."  The explanatory note to that heading clarifies that the heading "does not cover ... [a]ntibiotic preparations of a kind used in animal feeding (e.g. dried and standardised complete mycelium)."  Explanatory note 29.41.  The Court should therefore classify the subject merchandise under heading 2309 and grant judgment in the Government's favor.

## **ARGUMENT**

### I.    **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT Rule 56(a).  Because there is no dispute as to any material facts, the Court's

determination "of the classification of the goods collapses into a determination of the proper

meaning and scope of the HTSUS terms that, as a matter of statutory construction, is a question

of law." *RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024) (quotation

omitted).

"The HTSUS scheme is organized by headings, each of which has one or more

subheadings; the headings set forth general categories of merchandise, and the subheadings

provide a more particularized segregation of the goods within each category." *ADC Telecomms.,

Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019) (quotation omitted). "The first four

digits of an HTSUS provision constitute the heading, whereas the remaining digits reflect

subheadings." *Id.* (quotation omitted). The HTSUS also contains "General Rules of

Interpretation (GRIs) that govern the classification of merchandise." *RKW Klerks*, 94 F.4th at

1378. "The GRI[s] apply in numerical order, meaning that subsequent rules are inapplicable if a

preceding rule provides proper classification." *ADC Telecomms.*, 916 F.3d at 1017 (quotation

omitted).

"GRI 1 provides, 'classification shall be determined according to the terms of the

headings and any relative section or chapter notes.'" *RKW Klerks*, 94 F.4th at 1378 (quoting

GRI 1). Thus, "[w]hen applying GRI 1, [a] court first construes the language of the heading, and

any section or chapter notes in question, to determine whether the product at issue is classifiable

under the heading." *Id.* (quotation omitted). Where a tariff term is not defined in the HTSUS,

"the term's correct meaning is its common meaning," which is "presumed to be the same as its

commercial meaning." *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir.

2001) (quotation omitted). "In order to determine the common commercial meaning of a tariff

term, courts may consult dictionaries, encyclopedias, scientific authorities, and other reliable

information sources." *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011).

That includes the World Customs Organization's explanatory notes to the Harmonized Tariff

Schedule, which, though not binding, "are 'generally indicative' of the proper interpretation of a

tariff provision." *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008) (quotation

omitted). Courts credit "the unambiguous text of relevant explanatory notes absent persuasive

reasons to disregard it." *Id.*

After determining the heading under which a good is classified pursuant to GRI 1, the

Court must then determine the applicable subheading pursuant to GRI 6. "[T]he classification of

goods in the subheadings of a heading shall be determined according to the terms of those

subheadings and any related subheading notes and, *mutatis mutandis*, to the [preceding GRIs] on

the understanding that only subheadings at the same level are comparable." GRI 6.

## II. Zoetis's Feed-Grade Chlortetracycline Concentrate is a "Preparation[] of a Kind Used in Animal Feeding" of Heading 2309

To begin, Zoetis's feed-grade chlortetracycline concentrate meets the terms of heading

2309: it is a "[p]reparation[] of a kind used in animal feeding." There is no dispute that the

merchandise constitutes a "preparation," or "a substance specially prepared, or made up for its

appropriate use or application, e.g. as food or medicine …." *Orlando Food Corp. v. United*

*States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (quotation omitted). The only remaining question

is whether the merchandise is "of a kind used in animal feeding." Both explanatory note 23.09

and the *Carborundum* factors demonstrate that it is.

## A. Explanatory Note 23.09 Clarifies that Zoetis's Feed-Grade Antibiotic Product is Itself a Class or Kind of Goods Covered by Heading 2309, Obviating the Need for Further Analysis

Additional Rule of Interpretation 1 (ARI 1) "dictates how tariff classification should be

construed when the classification decision is controlled by use." *Primal Lite, Inc. v. United*

17

*States*, 182 F.3d 1362, 1363 (Fed. Cir. 1999). ARI 1(a) provides that "a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use." This ultimately "requires the court to determine what group of goods 'are commercially fungible with the imported goods.'" *In Zone Brands, Inc. v. United States*, 456 F. Supp. 3d 1309, 1318 (Ct. Int'l Trade 2020) (quoting *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1313 (Fed. Cir. 2012)).

The first issue, then, is determining what classes or kinds of goods heading 2309 covers. Here, the HTSUS does not explain what preparations are "of a kind used in animal feeding," but explanatory note 23.09 does. *See Degussa Corp. v. United States*, 508 F.3d 1044, 1048–49 (Fed. Cir. 2007) (courts can use explanatory notes to "define" heading terms). The explanatory note clarifies that heading 2309 covers microingredients used to make premixes for animal feed—in particular, antibiotics like Zoetis's.

The explanatory note first provides that heading 2309 "covers … prepared animal feeding stuffs consisting of a mixture of several nutrients designed" to make "complete or supplementary feeds," among other things. Explanatory note 23.09. In particular, the heading includes "complete feeds" that contain "[e]nergy" nutrients, "[b]ody-building" nutrients or minerals, and "[f]unction" nutrients like "vitamins, trace elements *and antibiotics*." *Id.* (emphasis added).

The explanatory note then continues that the heading also covers "preparations for use in making … complete feeds," which are "known in trade as 'premixes','" or "compound compositions consisting of a number of substances (sometimes called additives) the nature and proportions of which vary according to the animal production required." *Id.* These "substances"

making up premixes include "[t]hose which improve digestion and, more generally, ensure that

the animal makes good use of the feeds and safeguard its health: vitamins or provitamins, amino-

acids, *antibiotics*, coccidiostats, trace elements, emulsifiers, flavourings and appetisers, etc." *Id.*

(emphasis added).  "The concentration of" these substances in particular "and the nature of the

carrier are determined so as to ensure, in particular, homogenous dispersion and mixing of these

substances in the compound feeds to which the preparations are added." *Id.*

Finally, the explanatory note concludes that "this group" of products classifiable under

heading 2309 "also includes … [p]reparations consisting of an active substance … with a carrier,

for example products of the antibiotics manufacturing process obtained by simply drying the

mass, i.e. the entire contents of the fermentation vessel (essentially mycelium[1], the culture

medium and the antibiotic)." *Id.*  "The resulting dry substance, whether or not standardized by

adding organic or inorganic substances, has an antibiotic content ranging *generally* between 8%

and 16% and is used as basic material in preparing, in particular, 'premixes'." *Id.* (emphasis

added).  "The preparations of this group should not, however, be confused with certain

preparations for veterinary uses. The latter are generally identifiable by the medicinal nature and

much higher concentration of the active substance, and are often put up in a different way." *Id.*[2]

That description of antibiotic products used in making premixes covers Zoetis's feed-

grade chlortetracycline concentrate.  The subject merchandise is likewise the dried product of the

---

[1] The mycelium is the interwoven "mass of filaments formed by" fungi and by "some
bacteria (such as streptomyces)." *Mycelium*, Merriam-Webster Online Dictionary,
https://www.merriam-webster.com/dictionary/mycelium [perma.cc/GUW4-EGNJ].

[2] Notably, the explanatory note has remained consistent from the HTSUS's adoption to
the present day, *see* Gov't Ex. 15, explanatory note 23.09 (1986), despite regulatory restrictions
on antibiotic feed additives' use in the United States and many other countries using the
Harmonized System.  *See* J.I.R. Castanon, *History of the Use of Antibiotic as Growth Promoters
in European Poultry Feeds*, 86 Poultry Sci. 2466, 2470 (2007) [perma.cc/SDT4-QHG8] (noting
that antibiotic feed additives were banned in Europe beginning January 1, 2006).

"entire contents of the fermentation vessel—the bacterial colony, the chlortetracycline that it produced, and the remaining culture medium."  JSUF ¶ 12.  It has an antibiotic content just above the general range set forth in the explanatory note.  *Id.* ¶ 6 (23.8 to 24.7 percent).  And it is a "'microingredient' added to animal feed," *id.* ¶ 19, for ultimate inclusion in premixes, *id.* ¶ 33. *See Animal Feeds Compendium* at 156.

Moreover, the subject merchandise is not a "preparation[] for veterinary use[]." Explanatory note 23.09.  Although it is ultimately used under veterinary oversight, the subject merchandise is not used by veterinarians but rather by those in the animal feed distribution chain, JSUF ¶ 33, Schroeder Dep. at 29:11, 64:24–65:19, Schluender Dep. at 36:20–37:2; is generally not sold by veterinarians, who are on the sidelines of the animal-feed process, *id.*; has a lower concentration as administered when compared to injectable antibiotics, *see* Schroeder Dep. at 29:18–32:10; and is put up differently from those "dosage products," ZOETIS00810.

Zoetis's feed-grade chlortetracycline concentrate is thus properly classified under heading 2309.  Both this Court and the Federal Circuit have concluded that the explanatory notes are most persuasive where the subject merchandise is specifically described therein.  *See, e.g.*, *Govesan Am. Corp. v. United States*, 167 F. Supp. 2d 1374, 1379 (Ct. Int'l Trade 2001) (explaining that "[a]ll of the materials in the [subject merchandise] are accounted for in the Explanatory Note," that certain relevant substances were "also specifically provided for by the Explanatory Note," and that "the Explanatory Note describes exactly how the subject merchandise is used"); *Franklin v. United States*, 289 F.3d 753, 759 (Fed. Cir. 2002) (the subject merchandise's "similarity" to a product that was "specifically covered by the Explanatory Notes accompanying" the heading at issue supported the conclusion that the subject merchandise was classifiable under that heading); *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1210

(Fed. Cir. 2005) (reversing this Court in part because it overlooked an explanatory note's inclusion of the subject merchandise within a heading).  Because explanatory note 23.09 specifies that a product nearly indistinguishable from Zoetis's is properly classified under heading 2309, this Court should hold that Zoetis's merchandise is so classifiable.

**B.    Regardless, the *Carborundum* Factors Mandate Classification Under Heading 2309**

To further support that feed-grade chlortetracycline concentrate fits within heading 2309, the explanatory note makes clear that at least one class or kind of goods covered by heading 2309 is microingredients like antibiotics that are destined for inclusion in premixes.  *Dependable Packaging Sols., Inc. v. United States*, 757 F.3d 1374, 1379 (Fed. Cir. 2014) (using the explanatory note to determine the scope of the heading and guide the *Carborundum* analysis). To determine whether the subject merchandise is fungible with that class or kind of goods, as noted above, the Court analyzes the *Carborundum* factors.  *Minnetonka Brands, Inc. v. United States*, 110 F. Supp. 2d 1020, 1027 (Ct. Int'l Trade 2000).  Under *Carborundum*, the Court looks to "(1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class or kind of trade in which the merchandise moves; (4) the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed); (5) usage, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import; and (7) the recognition in the trade of the use."  *Id.* (citing *Carborundum*, 536 F.2d at 377).  Each of these factors supports classification of the subject merchandise under heading 2309, for much the same reasons as just discussed.

### 1. General Physical Characteristics

The merchandise's general physical characteristics demonstrate that it is the sort of microingredient added to premixes and included in feed that heading 2309 encompasses—in short, that it is a preparation "of a kind used in animal feeding."

To start, the merchandise is essentially identical to the description of antibiotics included in explanatory note 23.09. *See, e.g.*, *Dependable Packaging Sols.*, 757 F.3d at 1378–81 (holding it appropriate to rely on an explanatory note's inclusion of the subject merchandise to determine the scope of a use heading). It is "feed-grade," meaning that its physical characteristics make it suitable for inclusion in animal feed. Gov't Ex. 6, Association of American Feed Control Officials, *Feed Terms and Definitions*, *Official Publication* at 358 (2024). Indeed, its free-flowing properties ensure its homogenous dispersion throughout both a premix and animal feed. Tauren Dep. at 14:1–12, 18:2–19:24; PSMF ¶¶ 24-25; Explanatory note 23.09(II)(C).

Furthermore, the characteristics of the antibiotic contained in the subject merchandise, and ultimately included in animal feed after post-importation processing and mixing, have the effect of promoting an animal's growth and "safeguard[ing] its health." Explanatory note 23.09(II)(C)(1). As noted above, including antibiotics like chlortetracycline in animal feed can promote feed efficiency (meaning that animals can eat less feed) and weight gain in livestock, as well as reduce disease among a herd. *Micro Chem.*, 318 F.3d at 1121; *Use of Antibiotics as Feed Additives* at 1.

Moreover, the subject merchandise is produced the same way that the class of antibiotics described in explanatory note 23.09 is. Zoetis's feed-grade chlortetracycline concentrate is "obtained by simply drying … the entire contents of the fermentation vessel (essentially mycelium, the culture medium and the antibiotic)." Explanatory note 23.09(II)(C)(b); *see* JSUF

22

¶¶ 8–13.  The antibiotic content of the subject merchandise is 23.8 to 24.7 percent, JSUF ¶ 6, which is not far off from the general range of 8 to 16 percent mentioned in the explanatory note. Moreover, after the subject merchandise is incorporated into the CTC Products by mixing with excipients, its potency is standardized from anywhere between 7.7 to 22 percent, which falls within (and slightly above) that same general range.  JSUF ¶¶ 13, 25.[3]

Finally, the subject merchandise is dissimilar to the products for veterinary use that the explanatory note distinguishes.  Those products for veterinary use "are generally identifiable by the medicinal nature and much higher concentration of the active substance, and are often put up in a different way."  Explanatory note 23.09.  Products like Zoetis's Draxxin® fall within that category—they have a higher concentration of antibiotic and are put up as injectables.  Schroeder Dep. at 29:18–32:10.  But the subject merchandise is put up same way as, and has a similar antibiotic concentration to, the antibiotic product described in explanatory note 23.09 for premixes.

The subject merchandise thus has the same general physical characteristics as the class or kind of microingredients covered by heading 2309.

## 2.  Expectations of Ultimate Purchasers

The expectations of ultimate purchasers confirm that the merchandise is "of a kind used in animal feeding."  Zoetis, as the first purchaser in the distribution chain, expects only to use the subject merchandise to create Type A Medicated Articles—the CTC Products—that will

---

[3] With one exception discussed below, Customs has consistently classified similar antibiotic preparations with an antibiotic potency ranging from 20 to 30 percent under heading 2309.  HQ 086477 (Mar. 26, 1990) ("Though the Explanatory Notes dictate a range of 8-16 percent on the antibiotic content of goods which are to be classified in this Heading, and the product at issue has a 20-30 percent level; the range stated is qualified by the use of the word 'generally', which allows for some flexibility.");  HQ 083437 (Mar. 13, 1990) (same, for an antibiotic preparation with similar potency that was "standardized to a 6.7 percent strength with additives" after importation).

ultimately be included in animal feed. *See* Pl.'s Rog. Resps. at 18. And downstream purchasers

of these CTC Products, like NutraBlend, feed mills, and farmers, likewise expect to ultimately

use them in animal feed to achieve the effects that antibiotics provide, like protecting against

disease and maintaining animals' weight gain. *Id.* at 11–16; JSUF ¶¶ 31, 33

Though the FDA, since at least 2013, has advised that antibiotics like chlortetracycline

should not be used solely for non-therapeutic purposes like growth-promotion, that does not

mean that the subject merchandise is no longer within the class or kind of goods described by

heading 2309. For one thing, therapeutic use of antibiotic products like Zoetis's is consistent

with classification under heading 2309. The explanatory note itself states that the

microingredients classifiable under heading 2309 "ensure that the animal makes good use of the

feeds *and safeguard its health*." Explanatory note 23.09 (emphasis added). That farmers in the

United States now expect to use some antibiotic feed additives primarily to "safeguard [animals']

health" (as well as maintain weight gain in the presence of disease) thus *supports* classification

under heading 2309.

For another thing, ultimate purchasers' broader expectations—that the subject

merchandise will be used as a microingredient that will be incorporated into complete feed

through a premix—have not changed. In other words, although the FDA has sought to restrict

some ultimate uses of the subject merchandise, the *identity* of the subject merchandise and the

class or kind of goods to which it belongs have remained the same. Indeed, even after *Guidance*

*for Industry #213* became effective in 2017, Zoetis has marketed the CTC Products containing

the subject merchandise alongside other Type A Medicated Articles that only promote growth

within the same product category. Gov't Exs. 10, 11, 13.

Ultimate purchasers thus expect the subject merchandise to perform as a microingredient in animal feed, despite regulatory changes.

### 3. Channels of Trade

The channels of trade through which the subject merchandise moves also demonstrates that it is a microingredient classifiable under heading 2309. The subject merchandise is processed by Zoetis into the CTC Products, then sold primarily to feed mills and companies like NutraBlend that further process those products into premixes and ultimately into animal feed. JSUF ¶¶ 20–22, 33. And NutraBlend buys the CTC Products alongside other ingredients, like vitamins, trace minerals, and amino-acids, to include in its premixes for animal feed. Schluender Dep. 14:22–16:15, 33:9–15. Yet veterinarians generally are not involved in this channel of trade. *See* JSUF ¶ 33; Schluender Dep. at 36:20–37:2; Schroeder Dep. at 27:17–19, 29:11.

Moreover, injectable antibiotics do not move through this channel of trade—they instead move through veterinary channels of trade. NutraBlend, for example, does not purchase Zoetis's injectable antibiotics. Schluender Dep. at 19:23–25. But injectable antibiotics like Draxxin® are sold by Zoetis to veterinary supply companies. Schroder Dep. at 63:22–24.

Accordingly, that the subject merchandise moves through animal-feed channels of trade confirms that it is classifiable along with microingredients covered by heading 2309.

### 4. Environment of Sale

The environment of the subject merchandise's sale—its marketing, in particular—shows that it falls within the class or kind of growth-promoting and health-safeguarding microingredients described by heading 2309. Explanatory note 23.09(II)(C)(1). The subject merchandise is marketed by Zoetis's supplier as a product that, among other things, can "promote the permeation and absorption of the nourish elements, stimulating hypophysis to

produce hormone and adjusting appetites.  It results in obvious growth promotion for poultry, livestock and so on, also greatly increases the reward of feed."  Jinhe Biotechnology Co., Ltd., *Chlortetracycline Feed Grade (Powder/Granule)*, http://www.jinhe.com/en/product/Index/133 [perma.cc/C3SR-9KL2?type=image].

After Zoetis processes the subject merchandise to create the CTC Products, those products are marketed as "medicated feed additives" alongside growth-promoting products like Actogain®, Bovatec®, and MGA®.  Gov't Exs. 10, 13.  And Zoetis has obtained "cross-clearance approvals" to recommend the use of these growth-promotion products alongside the CTC Products, all while touting the "gains" that farmers' animals will achieve by including them in feed.  Gov't Ex. 11.  Moreover, even with the FDA's 2017 guidance, Zoetis can still market some of the CTC Products for maintaining "weight gain in the presence of disease."  JSUF ¶ 31.

But injectable antibiotics and other veterinary products are marketed in separate sections of Zoetis's catalog.  Gov't Ex. 13.  There do not appear to be "cross-clearance approvals" for their use alongside feed-additives.  Nor are injectable antibiotics marketed for maintaining weight gain in the presence of disease.  *See id.*

In short, the marketing of the subject merchandise and the CTC Products that Zoetis makes from it confirm that the subject merchandise fits comfortably within the class of goods described by heading 2309, as informed by explanatory note 23.09.

### 5.  Use in the Same Manner as Merchandise which Defines the Class

For similar reasons, the subject merchandise is used in the same manner as the microingredients covered by heading 2309.  Zoetis uses the subject merchandise to create the CTC Products, which in turn are incorporated into premixes by companies like NutraBlend to be incorporated into animal feed.  JSUF ¶¶ 20–22, 33.  NutraBlend does the same for other

microingredients, like vitamins, trace minerals, and amino-acids.  Schluender Dep. 14:22–16:15,
33:9–15.  And the CTC Products are used to treat disease, as well as promote the maintenance of
weight gain in the presence of disease, in a herd.  Pl.'s Rog. Resps. at 11–16.

Again, although the FDA restricted the subject merchandise's ultimate use for non-
therapeutic purposes in 2017, explanatory note 23.09 contemplates that microingredients
classifiable under heading 2309 "safeguard [animals'] health," and the FDA's guidance does not
change the identity of the subject merchandise as a preparation that is used as a microingredient
in premixes and, ultimately, in animal feed.  Nor does it matter that the merchandise must be
processed before it can be included in a premix and in animal feed.  *See* Mot. 31 (noting that the
merchandise cannot be fed directly to an animal).  "The merchandise only has one purpose and
many other recognized animal feed preparations require further processing, such as mixing,
before feeding to animals."  *H. Reisman Corp. v. United States*, 17 C.I.T. 1260, 1265 (1993).

### 6.  Economic Practicality

It also is economically practical to use the subject merchandise in animal feeding.  It is
cost-effective to include antibiotics in animal feed to reduce feed intake while maintaining
growth promoting (or weight maintaining) effects.  *Animal Feeds Compendium* at 128.  And it is
generally cheaper to safeguard the health of a whole herd by including the subject merchandise
in feed, rather than individually "pulling" animals to treat them with an injectable antibiotic.
Schroeder Dep. at 29:18–32:10.  It is accordingly economically practical to use the subject
merchandise as a microingredient in feed.

### 7.  Recognition in Trade

Finally, the trade recognizes that the subject merchandise is a microingredient that is used
in animal feed, just like the product singled out in explanatory note 23.09(II)(C)(b), rather than a

27

preparation for veterinary use like an injectable antibiotic.  Publications by the U.S. Department

of Agriculture and the Association of American Feed Control Officials, among others, recognize

antibiotic products like Zoetis's as "microingredients" used in feed additives to improve animals'

health and weight gain.  *See, e.g.*, *Animal Feeds Compendium* at iii, 128, 156; *Feed Inspector's*

*Manual* at 161.

*    *    *

In sum, each of the *Carborundum* factors demonstrates that Zoetis's feed-grade

chlortetracycline concentrate is a "[p]reparation[] of a kind used in animal feeding" of heading

2309, despite recent regulatory changes, because it is the same as, and is fungible with, the class

or kind of antibiotic products specifically mentioned in explanatory note 23.09.[4]

### C.    Note 1 to Chapter 23 Does Not Exclude Zoetis's Merchandise

In response, Zoetis claims that heading 2309 "only includes products that are 'not

specified or included elsewhere'" in the HTSUS, Mot. at 36, but this misreads note 1 to chapter

23.  Note 1 to chapter 23 states that heading 2309 "*includes* products of a kind used in animal

feeding, not elsewhere specified or included, obtained by processing vegetable or animal

materials to such an extent that they have lost the essential characteristics of the original

material, other than vegetable waste, vegetable residues and byproducts of such processing."

(Emphasis added.)

The note does not limit the heading "only" to products "not elsewhere specified or

included" that are "obtained" in a particular way, as Zoetis argues.  If that were the case, one

---

[4] At the subheading level, the subject merchandise is most appropriately classified under subheading 2309.90.95.  It is "not a mixed feed or mixed-feed ingredient, as those terms are used in Additional U.S. Note 1 to Chapter 23, HTSUS," JSUF ¶ 16, and therefore falls under subheading 2309.90's description of preparations "[o]ther" than those.  Nor is the subject merchandise a preparation "with a basis of vitamin $B_{12}$" of subheading 2309.90.70, requiring classification under subheading 2309.90.95 ("Other").

might have expected the HTSUS's drafters to include such a limitation in the heading text itself. At the least, the note might have provided that heading 2309 was "limited to" certain products "not elsewhere specified or included." Either way, the HTSUS's drafters would not have used the word "includes." "[T]he word 'includes,' when used in a statute, 'is usually a term of enlargement, and not of limitation.'" *Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 76 (2d Cir. 2022) (quoting *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008)).

By using the word "includes," the HTSUS's drafters thus made clear that note 1 is not a limitation on heading 2309's scope. *Id.* Rather, note 1 simply describes a particular subclass of products that must not be elsewhere specified or included in order to be classified under heading 2309: certain preparations of vegetable or animal materials. And as Zoetis explains, note 1's description of such products does not cover its feed-grade chlortetracycline concentrate. *See* Mot. at 37–39. Thus, note 1 does not apply to the subject merchandise.

Moreover, it would be strange to conclude that note 1 to chapter 23 created a limitation that precluded the subject merchandise's classification under heading 2309. Such a limitation would exclude not only the subject merchandise but also the very antibiotic preparation mentioned in explanatory note 23.09(II)(C)(b). But an interpretation of a chapter note that would render an explanatory note incorrect is "unlikely" to be right, to say the least. *Alcan Food Packaging (Shelbyville) v. United States*, 929 F. Supp. 2d 1338, 1350–51 (Ct. Int'l Trade 2013) ("If plastic film that has been laminated to another material constitutes 'further worked' [within the meaning of note 10 to chapter 39], then the Explanatory Notes are incorrect .... This seems unlikely."), *aff'd*, 771 F.3d 1364 (Fed. Cir. 2014). As such, note 1 does not preclude the subject merchandise's classification under heading 2309.[5]

_____

[5] And regardless, for the reasons explained below, the merchandise is not "elsewhere specified or included" in either heading 3003 or heading 2941.

III.    **Zoetis's Feed-Grade Chlortetracycline Concentrate is Not a "Medicament[] … Consisting of Two or More Constituents Which Have Been Mixed Together for Therapeutic or Prophylactic Uses" of Heading 3003**

Zoetis asserts that its merchandise is instead a "[m]edicament[] … consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses" of heading 3003.  However, there is just one constituent in the imported merchandise.  And even if, for argument's sake, there could be more than one constituent, consideration of the *Carborundum* factors and the product's use precludes its classification as a medicament.

A.    **Zoetis's Merchandise is Just One Constituent, Not "Two or More Constituents Which Have Been Mixed Together" as Heading 3003 Requires and Explanatory Note 30.03 Clarifies**

In full, heading 3003 covers "[m]edicaments (excluding goods of heading 3002, 3005 or 3006) consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses, not put up in measured doses or in forms or packings for retail sale[.]"  There is no dispute that the subject merchandise is "not put up in measured doses or in forms or packings for retail sale" and is not classifiable under the headings excluded in provisions' text.  Nor do the parties dispute that the merchandise contains more than just "nutritional substances." *Nutricia N. Am., Inc. v. United States*, 666 F. Supp. 3d 1363, 1380 (Ct. Int'l Trade 2023).  Indeed, Zoetis correctly recites the legal standards for the tariff terms "medicament," "therapeutic," and "prophylactic."  Mot. at 24–25.  But the undisputed facts also demonstrate that the subject merchandise consists of just *one* constituent, rather than "two or more which have been mixed together," as the heading requires.  Accordingly, the subject merchandise fails to meet the plain terms of heading 3003.

The HTSUS does not define what it means for a medicament to "consist[] of two or more constituents which have been mixed together," but explanatory note 30.03 provides useful

clarification.  It states that heading 3003 "covers medicinal preparations for use in the internal or external treatment or prevention of human or animal ailments. These preparations are obtained by *mixing together two or more substances*."  Explanatory note 30.03 (emphasis added).  Thus, covered under heading 3003 are "[p]reparations containing a single pharmaceutical substance *together with an excipient* …."  *Id.* (emphasis added).

This, however, does not describe Zoetis's feed-grade chlortetracycline concentrate.  The merchandise itself *is* the single pharmaceutical substance or API.  JSUF ¶ 6; Tauren Dep. at 22:24–23:19; PSMF ¶ 26.  And it is not mixed together with an excipient (or another API) until after importation.  Tauren Dep. at 22:24–23:19.  As such, the merchandise consists of just *one* constituent at the time of importation, not two or more mixed together.

True, the merchandise contains more than just chlortetracycline, as it also contains the other contents of the fermentation vessel, JSUF ¶ 12, but that does not mean that the merchandise consists of "two or more constituents which have been mixed together."  The "constituents" to which the heading is referring are APIs and inert ingredients like excipients, as the explanatory note clarifies—not all of the various elements that make up a "single pharmaceutical substance." Otherwise, there would have been no need for the explanatory note to specify that a "single pharmaceutical substance" is covered by heading 3003, so long as it is "together with an excipient" or other inert ingredients.  Explanatory note 30.03.  And for similar reasons, the relevant "mix[ing]" of the API with excipients (or an additional API) does not occur until after importation.  The subject merchandise "is the result of the fermentation" of bacteria, rather than mixing, and would thus not "appear to be 'mixed' as required by" heading 3003.  *H. Reisman Corp.*, 17 C.I.T. at 1260–61 & n.1; *cf.* explanatory note 29.41 (explaining that "[d]eliberate intermixtures of antibiotics (e.g., a mixture of penicillin and streptomycin) for therapeutic or

prophylactic uses"—that is, preparations containing more than just one antibiotic—may fall under heading 3003).

In short, the merchandise is "a single pharmaceutical substance" or API, not a preparation containing an API and an excipient that "have been mixed together" as heading 3003 requires.

**B.    Even if Zoetis's Merchandise Consisted of More Than One Constituent—Which it Does Not—the *Carborundum* Factors Confirm that the Merchandise Does Not Fall Under Heading 3003**

But even if Zoetis's feed-grade chlortetracycline concentrate did consist of "two or more constituents which have been mixed together" (it does not), it would still be classifiable only under heading 2309 under a *Carborundum* analysis. When competing headings are both limited by "use," the Court must decide, under GRI 1, ARI 1(a), and the *Carborundum* factors, with which heading's class or kind of goods the subject merchandise is fungible. *Dependable Packaging Sols.*, 757 F.3d at 1379–80. For the reasons discussed above, the subject merchandise belongs to the class or kind of microingredients and antibiotic feed additives described by heading 2309, not the class or kind of medicinal preparations that heading 3003 covers: the merchandise, which moves through animal-feed-related channels of trade rather than veterinary ones, has physical characteristics and uses that mirror those of the microingredients and antibiotic feed additives covered by heading 2309. *See* Section II.B, *supra*. That resolves the merchandise's classification under GRI 1.

Were resort to GRI 3(a) necessary, as Zoetis argues in the alternative, Mot. at 41–42, the merchandise would still be classifiable only under heading 2309. GRI 3(a) provides that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." As Zoetis notes, to determine which heading is more specific, the Court "look[s] to the provision with requirements that are more difficult to satisfy *and* that

describe the article with the greatest degree of accuracy and certainty." *Orlando Food Corp.*, 140 F.3d at 1441 (quotation omitted) (emphasis added).

Here, heading 2309 describes the subject merchandise "with the greatest degree of accuracy and certainty." *Id.* For one, heading 2309 is limited to merchandise used "in animal feeding." Heading 3003 is not so limited. It encompasses preparations that are not just ingested but also implanted or injected, as well as preparations for human use. Heading 2309 is thus narrower than heading 3003 in critical respects. But more importantly, explanatory note 23.09, in defining heading 2309's scope, states that a product virtually indistinguishable from Zoetis's belongs in heading 2309. There is no such specificity in explanatory note 30.03; in fact, explanatory note 29.41 reiterates that "[a]ntibiotic preparations of a kind used in animal feeding (e.g. dried and standardised complete mycelium)" belong in heading 2309. Heading 2309 thus "describe[s] the article with the greatest degree of accuracy and certainty." *Orlando Food Corp.*, 140 F.3d at 1441.

Zoetis suggests that because its merchandise "must undergo post-importation processing to be used as a medicinal additive to animal feed," heading 2309 "does not address the full purpose of the subject" merchandise, Mot. at 41–42, but that suggestion falls short. To start, Zoetis's reasoning would preclude classification under heading 3003, too. The merchandise cannot be used "therapeutic[ally]," heading 3003, without the post-importation processing that dilutes its concentration and incorporates it into animal feed. PSMF ¶ 7.

In any event, at the time of importation, Zoetis's feed-grade chlortetracycline concentrate is "used in animal feeding." As this Court has explained before, many "animal feed preparations require further processing, such as mixing, before feeding to animals." *H. Reisman Corp.*, 17 C.I.T. at 1265 (classifying a product that required post-importation processing before

animal feeding under heading 2309).  And if Zoetis's interpretation were right, it would mean

that the explanatory note is wrong to include antibiotic preparations under heading 2309—which,

again, means that Zoetis is wrong.  *Alcan Food Packaging*, 929 F. Supp. 2d at 1350–51

(rejecting an interpretation of the HTSUS that would make the explanatory note incorrect).

Accordingly, whether under GRI 1 or GRI 3(a), the subject merchandise is classifiable

under heading 2309 alone.

## IV.    Note 1 to Chapter 29 and Explanatory Note 29.41 Preclude the Merchandise's Classification Under Heading 2941 as an Antibiotic

Finally, the subject merchandise is not classifiable as an "[a]ntibiotic[]" of heading 2941

as Zoetis asserts.  Mot. at 10-14.  Zoetis fails to appreciate the applicable explanatory notes and

chapter notes.  The HTSUS itself does not define the term "antibiotic," but explanatory note

29.41 does.  "Antibiotics are substances secreted by living micro organisms which have the

effect of killing other micro organisms or inhibiting their growth.  They are used principally for

their powerful inhibitory effect on pathogenic micro organisms, particularly bacteria or fungi, or

in some cases on neoplasms.  They can be effective at a concentration of a few micrograms per

ml in the blood."  Explanatory note 29.41.  The explanatory note further clarifies that

"[a]ntibiotic preparations of a kind used in animal feeding (e.g. dried and standardised complete

mycelium)" are *not* covered by heading 2941's description.  *Id.*  Instead, they fall under "heading

23.09."  *Id.*  That exclusion plainly covers Zoetis's feed-grade chlortetracycline concentrate,

which is dried complete mycelium, *see* JSUF ¶ 12; PSMF ¶ 17, used in animal feeding, and

described by explanatory note 23.09.  That alone requires the merchandise's classification under

heading 2309.  *See, e.g.*, *Warner-Lambert Co.*, 407 F.3d at 1210 (merchandise properly

classified under the heading whose explanatory note "expressly encompass[ed]" the

merchandise).

Even without relying on the explanatory note to define the heading's scope, the subject merchandise still cannot be classified as an "[a]ntibiotic[]" of heading 2941 because it fails note 1 to chapter 29's requirements. Note 1 to chapter 29 provides that, "[e]xcept where the context otherwise requires, the headings of this chapter apply only to: (a) Separate chemically defined organic compounds, whether or not containing impurities; (b) Mixtures of two or more isomers of the same organic compound (whether or not containing impurities) …;" and "(c) … [T]he products of heading 2941, whether or not chemically defined." The note further states that these compounds may be dissolved in a solvent or stabilized with appropriate substances, so long as it is necessary for the compounds' preservation or transport rather than preparation for a particular use. Note 1 to chapter 29.

The subject merchandise does not meet the terms of this note. Zoetis's feed-grade chlortetracycline concentrate is not just the antibiotic chlortetracycline. Rather, it is the "entire" "filtered and dried" "contents of the fermentation vessel," JSUF ¶ 12, which includes "mycelial cake, microbial cells, residual nutrients, other fermentation components, and metabolic products," PSMF ¶ 17. That eliminates note 1(b) and (c): the merchandise is neither merely an antibiotic (note 1(c)) nor a mixture of two or more antibiotic isomers (note 1(b)).

Nor are the terms of note 1(a) met. The non-antibiotic substances in the feed-grade chlortetracycline concentrate are not mere "impurities" that still render the subject merchandise suitable for general use. Substances that "are deliberately left in the product with a view to rendering it particularly suitable for specific use rather than for general use … are not regarded as permissible impurities." General explanatory note to chapter 29 (emphasis omitted). Here, the largely proteinaceous material in the subject merchandise is deliberately left in, is not removed during any step of the pre- or post-importation processing, and constitutes over 75

35

percent of the merchandise, which is solely used to make premixes for animal feed.  *See* Gov't Ex. 7, Plaintiff's Interrogatory Responses at 5; *H. Reisman Corp.*, 17 C.I.T. at 1263 ("The proteinaceous material is not simply an impurity in the vitamin B–12 product.  The addition of proteinaceous material is a natural part of the manufacturing process and there is no need or desire to eliminate the material from this animal food product.").  The same goes for calcium carbonate, which is included in the subject merchandise's fermentation broth to specifically prepare the merchandise for use in animal feed.  PSMF ¶ 18; Schroeder Dep. at 47:5–14 ("[I]t makes it stable so it doesn't degrade when you mix it into feed[.]").  The non-antibiotic substances in the subject merchandise are thus not permissible "impurities" that offer no use-specific benefits.  To accept Zoetis's argument—that the merchandise is essentially chlortetracycline, and therefore heading 2941 must cover it *eo nomine*, Mot. at 10-11—the Court would, "in essence, [have] to ignore the careful listing of Note 1 and essentially all of the explanatory notes[.]"  *H. Reisman Corp.*, 17 C.I.T. at 1264.  Because the subject merchandise contains substances that are not permitted under note 1 to chapter 29, it cannot be classified under heading 2941.

It is true, as Zoetis emphasizes at length, that Customs classified what is essentially the same product as the subject merchandise under heading 2941 in a ruling that was issued after this case was commenced.  Mot. at 14-23; HQ H325604 (Aug. 31, 2023).  But for a number of reasons, this ruling should be disregarded.

First and foremost, this Court decides the law, not Customs.  Customs' classification rulings may be consulted for their persuasive value, if any, *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001), but cannot substitute for judicial interpretation of the HTSUS, *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  Indeed, Congress required

this Court to reach the correct result based on the record made before it. *Jarvis Clark Co. v. United States*, 733 F.2d 873, 877–78 (Fed. Cir. 1984) (citing 28 U.S.C. § 2643(b)); 28 U.S.C. § 2640(a)(1).  The Court should do so here and classify the subject merchandise under heading 2309.

Moreover, HQ H325604's conclusions as to the feed grade chlortetracycline concentrate are simply wrong as a matter of law and should not be considered persuasive.  The ruling was based on a request submitted by a different importer and considered only the limited set of facts that that importer submitted—not the facts in this case, which were obtained through adversarial litigation and provide a more accurate and complete understanding of the true nature of the subject merchandise.  Indeed, Customs was not aware, from the limited record before it, that the product it was classifying was virtually identical to Zoetis's; had it known, it would not have issued the ruling in view of its regulations, which provide that "[n]o ruling letter will be issued with respect to any issue which is pending before the United States Court of International Trade ...."  19 C.F.R. § 177.7(b).

Accordingly, Zoetis's merchandise is not classifiable under heading 2941, despite what Customs later said in HQ H325604 regarding what appears to be the same product.  Instead, for all the reasons discussed above, the subject merchandise is classifiable under heading 2309.

## **CONCLUSION**

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny Zoetis's motion for summary judgment, and enter judgment in the Government's favor.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

/s/ Luke Mathers
*Of counsel*:                                LUKE MATHERS
MICHAEL A. ANDERSON                          Trial Attorney
Office of the Assistant Chief Counsel         Department of Justice, Civil Division
International Trade Litigation                Commercial Litigation Branch
U.S. Customs and Border Protection            26 Federal Plaza – Suite 346
                                             New York, New York 10278
                                             (212) 264-9236
Dated: June 30, 2025                         *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| _____ : | |
| ZOETIS SERVICES, LLC, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Court No. 22-00056 |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |
| _____ : | |

## <u>**CERTIFICATE OF COMPLIANCE**</u>

I, Luke Mathers, an attorney in the Office of the Assistant Attorney General, Civil

Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for

the foregoing brief, relying upon the word count feature of the word processing program used to

prepare the brief, certify that this brief complies with the word count limitation under the Court's

standard chambers procedures, and contains 10,739 words.

<u>/s/ Luke Mathers</u>
LUKE MATHERS