**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., *JUDGE***

| | | |
|---|---|---|
| ZOETIS SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No.  22-00056 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## <u>ORDER</u>

Having considered Plaintiff's Motion for Summary Judgment [ECF No. 41] and Defendant's Cross-Motion for Summary Judgment [ECF No. 51] in the above-captioned action, and upon consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgement is granted; and it is further

**ORDERED** that Defendant's Cross-Motion for Summary Judgment is denied; and it is further

**ORDERED** that judgment be entered in favor of Plaintiff.


_____
**JUDGE**

DATED: _____
        New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JOSEPH A. LAROSKI, JR., *JUDGE***

| | | |
|---|---|---|
| ZOETIS SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Court No.  22-00056 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted:

**FAEGRE DRINKER BIDDLE & REATH LLP**
Attorneys for Plaintiff
Zoetis Services LLC
320 S. Canal Street
Suite 3300
Chicago, IL 60606
Telephone (312) 569-1000

By:    /s/ Wm. Randolph Rucker
       Wm. Randolph Rucker

Dated: September 19, 2025

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................1

SUMMARY OF THE ARGUMENT........................................................................1

ARGUMENT ...........................................................................................................2

I.    Defendant Is Not Entitled to Summary Judgment in this Case ...............................2

II.    Chapter 29, Note 1 and the Heading 2941 Explanatory Notes Support Classification of the CTC Concentrate as an Antibiotic in Heading 2941 .............3

    A.    The Subject Merchandise Is One API With Allowed Impurities ................3

    B.    The CTC Concentrate Should Only Be Excluded from Heading 2941 if It Is a "Mixture" or "Preparation" as Contemplated by Heading 3003 ...........................................................................................8

III.    Alternatively, the CTC Concentrate Is a "Medicament . . . Consisting of Two or More Constituents Which Have Been Mixed Together for Therapeutic or Prophylactic Uses" of Heading 3003 ...........................................9

    A.    The CTC Concentrate Consists of Two or More "Constituents" Which Have Been Mixed Together ..................................................................9

    Defendant Admits that the Subject Merchandise Is a "Mixture" ...............9

    The CTC Concentrate Is for "Therapeutic or Prophylactic Use"..............12

    B.    Heading 3003 Is the Proper Classification when a Preparation Administered in Animal Feed Is Primarily Medicinal ...............................13

        i.    Heading 3003 ENs Include the CTC Concentrate as Preparations Containing a Single Pharmaceutical Substance Together with an Excipient, Sweetening Agent, Agglomerating Agent, Support, Etc. ...........................................13

        ii.    Heading 3003 ENs Do Not Exclude the CTC Concentrate Because It Is Not "Solely" for Feeding ...........................................14

    C.    WCO Compendium Decisions Support Classification of Preparations of a Kind Used in Animal Feeding Under Heading 3003...............................................................................................19

IV.    The CTC Concentrate Is Not a "Preparation" Classifiable in Heading 2309 ........24

    A.    CTC Concentrate Is Not the Class or Kind of Goods Covered by Heading 2309.......................................................................................24

        i.    The CTC Concentrate Is Not a "Complete" or "Supplementary" Feed...............................................................24

        ii.    The CTC Concentrate Is Not a "Premix"...............................25

        iii.    The CTC Concentrate Does Not Contain a "Carrier" at Time of Importation..........................................................27

iv. The Government Misinterprets the Meaning of
"Preparations for Veterinary Use" ....................................................27

B. Heading 2309 Is a Basket Provision ............................................................30

V. The Legal Analysis and Factual Determinations of HRL H325604 Should
Be Given Deference.................................................**Error! Bookmark not defined.**

CONCLUSION........................................................................................................................36

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Airflow Tech., Inc. v. United States*,
   524 F.3d 1287 (Fed. Cir. 2008) .................................................................4, 5

*Archer Daniels Midland Co. v. United States*,
   561 F.3d 1308 (Fed. Cir. 2009) ...................................................................31

*Austin Chem. Co. v. United States*,
   835 F.2d 1423 (Fed. Cir. 1987) ...................................................................27

*Austin Chem., Inc. v. United States*,
   659 F. Supp. 229 (Ct. Int'l Tr. 1987) ..........................................................12

*B. Westergaard & Co. v. United States*,
   19 C.C.P.A. 299 (1932)................................................................................10

*BASF Corp. v. United States*,
   427 F. Supp. 2d 1200 (Ct. Int'l Tr. 2006), *aff'd*, 497 F.3d 1309 (Fed. Cir. 2007)......................................................................................................12, 13

*BASF Corp. v. United States*,
   778 F. Supp. 3d 1367 (Ct. Int'l Tr. 2025).............................................12, 31

*Chae v. Yellen*,
   579 F. Supp. 3d 1343 (Ct. Int'l Tr. 2022) ...................................................29

*Cummins Inc. v. United States*,
   454 F.3d 1361 (Fed. Cir. 2006) ...................................................................20

*Drygel, Inc. v. United States*,
   541 F.3d 1129 (Fed. Cir. 2008) ...................................................................14

*EM Indus., Inc. v. United States*,
   999 F. Supp. 1473 (Ct. Int'l Tr. 1998) ........................................................31

*Frosted Fruit Prods. Co. v. United States*,
   18 Cust. Ct. 119 (1947).................................................................................10

*H. Reisman Corp. v. United States*,
   17 C.I.T. 1260 (1993)......................................................................................8

*Int'l Bus. Machs. Corp. v. United States*,
   152 F.3d 1332 (Fed. Cir. 1998) ...................................................................31

*Klamath Claims Comm. v. United States*,
   541 F. App'x. 974 (Fed. Cir. 2013).............................................................29

*Mattel, Inc. v. United States*,
   346 F. Supp. 2d 1295 (Ct Int'l Tr. 2004) .................................................................34, 35

*Metchem, Inc. v. United States*,
   441 F. Supp. 2d. 1269 (2006), *aff'd*, 513 F.3d 1342 (Fed. Cir. 2008) .....................................32

*Michael Simon Design, Inc. v. United States*,
   501 F.3d 1303 (Fed. Cir. 2007) ...............................................................................4

*Midwood Indus., Inc. v. United States*,
   313 F. Supp. 951 (Cust. Ct. 1970)............................................................................6

*Nutricia N. Am., Inc. v. United States*,
   666 F. Supp. 3d 1363 (Ct. Int'l Trade 2023) ..............................................................15

*Orlando Food Corp. v. United States*,
   140 F.3d 1437 (Fed. Cir. 1998) ....................................................................... 10, 11, 32

*Phone-Mate, Inc. v. United States*,
   690 F. Supp. 1048 (Ct. Int'l Trade 1988), *aff'd* 867 F.2d 1404 (Fed. Cir. 1989) .....................2

*Processed Plastics Co. v. United States*,
   473 F.3d 1164 (Fed. Cir. 2006) ..............................................................................27

*R.T. Foods, Inc. v. United States*,
   757 F.3d 1349 (Fed. Cir. 2014) ...........................................................................30, 31

*Roche Vitamins, Inc. v. United States*,
   772 F.3d 728 (Fed. Cir. 2014) ................................................................................6

*Rollerblade, Inc. v. United States*,
   282 F.3d 1349 (Fed. Cir. 2002) ..............................................................................31

*Saab Cars USA, Inc. v. United States*,
   434 F.3d 1359 (Fed. Cir. 2006) ...............................................................................2

*United States v. A. Sahadi & Co. Inc.*,
   23 C.C.P.A. 293 (1936).......................................................................................10

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ..........................................................................................34

*Wilton Indus., Inc. v. United States*,
   493 F. Supp. 2d 1294 (Ct. Int'l Tr. 2007) ..................................................................15

**Statutes, Rules & Regulations**

19 C.F.R. § 177 ..................................................................................................36

19 C.F.R. § 177.2(b) ...................................................................................................... 35

21 C.F.R. § 558(b) ......................................................................................................... 16

21 C.F.R. § 558.6(a)(3) .................................................................................................. 16

21 C.F.R. § 558.6(a)(6) .................................................................................................. 16

Compendium of Classification Opinions,
    https://www.wcoomd.org/en/topics/nomenclature/instrument-and-tools/tools-
    to-assist-with-the-classification-in-the-hs/compendium.aspx .................................. 20

U.S. Ct. Int'l Trade R. 56 ................................................................................................ 1

U.S. Ct. Int'l Trade R. 56(a) ............................................................................................ 2

**Other Authorities**

Aureo S 700® Granular (last accessed Sept. 19, 2025) ................................................. 29

Daily Med -
    https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=f86501dd-61c8-
    451b-ad5e-562e349fbd37 ....................................................................................... 22

Daily Med listing of CTC Calcium Feed Grade powder or granule
    https://dailymed.nlm.nih.gov/dailymed/search.cfm?labeltype=all&query=CH
    LORTETRACYCLINE+FEED+GRADE&pagesize=100&page=1 (last
    accessed Sept. 10, 2025) .......................................................................................... 7

DailyMed - AUREOMIX S 40/40 GRANULAR- chlortetracycline and
    sulfamethazine granule (last accessed Sept. 19, 2025) ........................................... 29

DailyMed - AUREOMYCIN 90 MEAL- chlortetracycline hydrochloride granule
    (last accessed Sept. 19, 2025) ................................................................................ 29

DailyMed - AUREOMYCIN- chlortetracycline hydrochloride granule (last
    accessed Sept. 19, 2025) ........................................................................................ 29

DailyMed - CHLORMAX 50- chlortetracycline granule (last accessed Sept. 19,
    2025) ...................................................................................................................... 29

Efficient & Professional Supplier of Feed Additives; CN103479658A -
    Maduramicin ammonium nicarbazin premix and preparation method thereof -
    Google Patents (last accessed Sept. 10, 2025) ........................................................ 21

EN 23.09(II)(c)(b) ............................................................................................... 32, 35

Federal Food and Drug Administration (July 2019),
    https://www.fda.gov/media/128687/download (last accessed Sept. 18, 2025) ......... 14

Hexarobin Poultry Feed Additives, Packaging Type: HDPE Bag, Granules at ₹ 90/kg in Hyderabad (last accessed Sept. 10, 2025) ..................................................22

HRL 967895 (Mar. 16, 2006) ..........................................................................................7

HRL H325604 (Aug. 31, 2023) ........................................................................ 34, 35, 36

https://www.cbp.gov/trade/rulings/eruling-requirements (last accessed Aug. 11, 2025) ..........................................................................................................................36

Nicarbazin - an overview | ScienceDirect Topics (last accessed Sept. 10, 2025) ..........21

Nicarbazin | C19H18N6O6 | CID 9507 - PubChem (last accessed Sept. 10, 2025) ......21

Nicarbazin 8%+ Maduramycin 0.75% - AGP alternatives,Anticoccidials,Antibiotic substitutes-Phiphar healthcare limited (last accessed Sept. 19, 2025) ....................................................................................21

Oxford English Dictionary, general, adj. & n. meanings, etymology and more | Oxford English Dictionary (last accessed Sept. 10, 2025) ..........................................6

Oxford English Dictionary, specific, adj. & n. meanings, etymology and more | Oxford English Dictionary (last accessed Sept. 10, 2025) ..........................................6

Robenidine | C15H13Cl2N5 | CID 9570438 - PubChem (last accessed, Sept. 10, 2025) ........................................................................................................................21

Robenidine Hydrochloride Premix 10% Coccidiostat for Poultry Rabbit Sheep Cattle Factory GMP - Robenz and Cycostat 66g (last accessed Sept. 10, 2025) ....................22

Robenz® (last accessed Sept. 10, 2025) ........................................................................22

Veterinarian, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/veterinarian (last accessed Aug. 21, 2025) ..........................28

Veterinary, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/veterinary (last accessed Aug. 21, 2025) ............................28

WCO 64th Session, NC2691B1b ...................................................................................21

WCO 64th Session, NC2692E1b/P/3 .............................................................................20

WCO 64th Session, NC477E1a .....................................................................................20

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ......................................................................................1

Heading 2309 ..............................................................................................................1, 35

Heading 2941 .................................................................................................................................2, 35

Heading 3003 .......................................................................................................................................2

Chapter 23, Note 1 ........................................................................................................ *passim*

Chapter 29, Note 1 ........................................................................................................ *passim*

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., *JUDGE*

| | | |
|---|---|---|
| ZOETIS SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No.  22-00056 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Zoetis Services, LLC ("Plaintiff") submits this response to the Government's ("Defendant") Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 51] (hereinafter "Def.'s Cross-Mot."). U.S. Ct. Int'l Trade R. 56. Summary judgment is appropriate in this case because there are no genuine issues of material fact in dispute. Therefore, the only issue before this Court is the proper legal interpretation of the competing tariff provisions. For the reasons discussed below, this Court should deny Defendant's Cross-Motion for Summary Judgment and enter summary judgment in favor of Plaintiff.

**SUMMARY OF THE ARGUMENT**

Contrary to Defendant's assertion, the imported products at issue ("CTC Concentrate") are not properly classified under heading 2309 of the *Harmonized Tariff Schedule of the United Schedules* ("HTSUS"). Per General Rule of Interpretation ("GRI") 1, the CTC Concentrate should

be classified as an antibiotic under HTSUS heading 2941, or alternatively, as a medicament for therapeutic or prophylactic uses under HTSUS heading 3003.

## ARGUMENT

### I.     Defendant Is Not Entitled to Summary Judgment in this Case

Along with its response to Plaintiff's Motion for Summary Judgment [ECF No. 41] (hereinafter "Pl.'s Br."), Defendant has filed a Cross-Motion for Summary Judgment in this case. (*See generally* Def.'s Cross-Mot.) "In ruling on motions for summary judgment, if there are no genuine issues of material fact, the court must decide whether either party has demonstrated its entitlement to judgment as a matter of law." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Trade 1988), *aff'd* 867 F.2d 1404 (Fed. Cir. 1989). The parties agree there is no genuine dispute as to any material fact in this case. (Pl.'s Br. at 19; Def.'s Cross-Mot. at 9; Def.'s Resp. to Pl.'s Statement of Material Facts Not in Issue (hereinafter "Def.'s Resp. to Pl.'s SMF") at 1.) However, Defendant has not demonstrated its entitlement to judgment as a matter of law.

Defendant (as the movant) bears the burden of proving that it is entitled to judgment as a matter of law; and, as the non-moving party, Defendant has the burden to show why summary judgment should not be granted to Plaintiff. *See, e.g.*, *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368-69 (Fed. Cir. 2006) (discussing the burdens of non-moving and moving parties for summary judgment). Defendant's arguments are unpersuasive and do not demonstrate entitlement to judgment as a matter of law; therefore, Defendant's Motion must be denied. Further, Defendant has failed to show why summary judgment should not be granted in favor of Plaintiff. Accordingly, and for the reasons set forth herein and in Plaintiff's Motion, Plaintiff respectfully asserts that it has shown it is entitled to judgment as a matter of law. U.S. Ct. Int'l Trade R. 56(a) (this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

II.     **Chapter 29, Note 1 and the Heading 2941 Explanatory Notes Support Classification of the CTC Concentrate as an Antibiotic in Heading 2941**

A.     **The Subject Merchandise Is One API With Allowed Impurities**

Defendant's assertion that heading 2941 is not the correct classification for the CTC Concentrate is premised on a misunderstanding of Chapter 29, Note 1 and the heading 2941 Explanatory Notes ("ENs"). There is no dispute that the CTC Concentrate is an antibiotic and that antibiotics are covered *eo nomine* by heading 2941. (JSUF ¶ 6; Ex. 28.[1]) While Defendant correctly states that the heading 2941 ENs provide certain exclusions from this heading, including "[a]ntibiotic preparations of a kind used in animal feeds (e.g. dried and standardized complete mycelium)," that description does not capture the CTC Concentrate. (Def. Cross-Mot. at 42.[2])

Defendant offers only an unsupported conclusion that the CTC Concentrate is an antibiotic preparation of a kind used in animal feeding in order to support its asserted tariff classification. There are no facts to support that the CTC Concentrate is a standardized animal feeding preparation as contemplated by the ENs. Regardless, this analysis is not relevant for the classification issue at hand as the CTC Concentrate is covered by heading 2941, as an antibiotic, or heading 3003, as a medicament, and is not directed to heading 2309 by the HTSUS language or the ENs for these headings—*i.e.*, the CTC Concentrate is either an antibiotic with impurities or a medicament mixture that does not have the antibiotic added solely to enhance the feeding aspect of the preparation.

Considering the heading 2941 ENs only direct "standardized" antibiotic preparations to heading 2309, it follows that non-standardized, crude antibiotic substances would either remain in

---

[1] Citations to "Ex." refer to Plaintiff's exhibits filed in support of its Motion for Summary Judgment and in support of this response to Defendant's Cross-Motion for Summary Judgement.

[2] Pincites to ECF filings refer to the ECF page number.

heading 2941 or be directed to another heading. The CTC Concentrate is a bulk, crude ingredient for Type A Medicated Articles. (*See* Ex. 32 (stating "Caution: For Manufacturing, Processing or Repacking Only").) It is not a preparation that can be fed to animals. (Schroeder Dep. 99:22 – 100:6 (stating that feeding the CTC Concentrate directly to animals would make them sick or kill them)). Therefore, the exclusion in the heading 2941 ENs does not apply to the CTC Concentrate.

Further, the concept of "dried and standardized" preparations being excluded by the 2941 ENs is indicative of some further processing of the antibiotic. As Defendant acknowledges, the CTC Concentrate is not standardized until it is processed into Type A Medicated Articles after importation. (Def.'s SOF ¶ 11). This aligns with the classification of some preparations or mixtures containing antibiotics in heading 2309, heading 2941, or heading 3003, with the proper classification determined on a case-by-case basis. Thus, while the 2941 ENs direct certain standardized antibiotic preparations of a kind used in animal feeds to heading 2309, not all antibiotic preparations of a kind used in animal feeds are classified there. (*See* Ex. 33 & 34; *infra* part III.)

Even assuming the heading 2941 ENs directed the CTC Concentrate to heading 2309 (they do not), this would contradict the language of HTSUS Chapter 29, Note 1. Where the ENs are contradictory to the HTSUS or established interpretations thereof, they are not persuasive. *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1293 (Fed. Cir. 2008) (citing *Michael Simon Design, Inc. v. United States*, 501 F.3d 1303, 1307 (Fed. Cir. 2007)) ("However, when the language of the tariff provision is unambiguous and the Explanatory Notes contradictory, 'we do not afford [the Explanatory Notes] any weight.'"). Thus, the exclusion stated in EN 29.41 for antibiotic preparations of a kind used in animal feeds cannot be considered determinative in this case.

Defendant also incorrectly argues that the CTC Concentrate cannot be classified under heading 2941 because it is not covered by Chapter 29, Note 1 which lists products covered by Chapter 29. (Def.'s Cross-Mot. at 43-44.) Chapter 29, Note 1(a) states that this chapter covers "[s]eparate chemically defined organic compounds, whether or not containing impurities." (Ex. 28; Pl. Mot. at 30-31). This includes antibiotics such as chlortetracycline, which is specifically covered by heading 2941. The CTC Concentrate is a "[s]eparate chemically defined organic compound[]," containing impurities. (*See* Ex. 31). Defendant concedes this point; therefore, the central dispute in this case is whether the other components in the CTC Concentrate—*i.e.*, the "mycelial cake, microbial cells, residual nutrients, other fermentation components, and metabolic products"—constitute "impurities" as contemplated by the Chapter Note and further clarified in the Explanatory Notes. (*Id.*; Def.'s Cross Mot. at 43-44.)

Defendant asserts that the other components in CTC Concentrate do not constitute "impurities" because they "are deliberately left in the product with a view to rendering it particularly suitable for specific use rather for general use . . ." (Def.'s Cross-Mot. at 43 (citing Chapter 29 General Explanatory Notes).) However, this argument cuts against the asserted conclusion as the Chapter 29 ENs clearly provide that "[t]he term 'impurities' applies exclusively to substances whose presence in the single chemical compound results solely and directly from the manufacturing process (including purification)." Based on the Defendant's admission, the referenced components are "impurities" left in the product from the manufacturing process.

Further, Defendant has not provided any support to demonstrate that the other components in the CTC Concentrate were deliberately left in to make the product "particularly suitable for specific use," nor has Defendant defined "specific use" and "general use" for purposes of Chapter 29. Because the ENs do not provide any additional guidance on the meaning of those terms, we

rely on dictionary definitions to interpret them. Based on common definitions, a "specific use" is a "clearly defined or identified" use whereas "general use" is a "widespread" use.[3] *See Midwood Indus., Inc. v. United States*, 313 F. Supp. 951, 957 (Cust. Ct. 1970) (distinguishing producer's good, unfinished steel articles that can be used for many purposes, from consumer's goods that were finished article used for a specific end purpose).

The Federal Circuit's decision in *Roche Vitamins, Inc. v. United States* provides further insight. 772 F.3d 728 (Fed. Cir. 2014). In *Roche Vitamins*, the court evaluated whether BetaTab, "a mixture containing beta-carotene, antioxidants, gelatin, sucrose, and corn starch" was suitable for a specific or general use under Chapter 29. *Id.* at 729. The court determined that the presence of stabilizer ingredients did not render the product for a specific use. *Id.* at 733. Rather, the court found BetaTab can be used as a "source of vitamin A in foods, beverages, and vitamin products." *Id.* at 729. Like the product at issue in *Roche Vitamins*, CTC Concentrate is for general use as that term is understood in Chapter 29. Akin to the BetaTab product, the CTC Concentrate has stabilizer ingredients, and can be used as an intermediate component drug product that is further diluted to make various standardized Type A Medicated Articles, which can then be utilized to make many types of Type B and Type C Medicated Feeds.

We assert the leftover starting materials and by-products from the fermentation process do not remain in the CTC Concentrate to serve a clearly defined use. Instead, these materials are left in due to manufacturing convenience as this is a crude product that will be further processed after importation. (Schroeder Dep. 47: 23 – 48:5 (stating that the mycelial cake "becomes then part of what [Zoetis] add to some other ingredients to make the Type A Medicated Article.")) The Chapter

---

[3] *See* Oxford English Dictionary, specific, adj. & n. meanings, etymology and more | Oxford English Dictionary (last accessed Sept. 10, 2025); Oxford English Dictionary, general, adj. & n. meanings, etymology and more | Oxford English Dictionary (last accessed Sept. 10, 2025).

29 General ENs is clear that this type of material, which is present "solely and directly from the manufacturing process," is considered an impurity as contemplated by Chapter 29, Note 1(a). The components present in the CTC Concentrate beyond the chlortetracycline are simply left in to enhance the stability of the product for further processing. *(See* Ex. 1, Schroeder Dep. at 47:22-24 ("[W]e've got the CTC Concentrate mycelial cake, because it is more stable instead of just CTC crystallin.").)

The chlortetracycline in the CTC Concentrate is also stabilized by adding calcium carbonate to the fermentation broth. (*See* PSMF ¶ 18 (citing Ex. 1, Schroeder Dep. 47:5-14, 51:8-13).) If this additional material is not considered to be an impurity, then the CTC Concentrate product is properly considered to be a mixture. (PSMF ¶ 16.) Chapter 29, Note 1(f) specifically addresses such mixtures and provides that Chapter 29 applies to: "… (f) The products mentioned in (a), (b), (c), (d) or (e) above with an added stabilizer (including an anticaking agent) necessary for their preservation or transport …" (HTSUS Ch. 29, note 1(f).) Even though the CTC Concentrate is a mixture, it consists only of chlortetracycline with impurities from the manufacturing process and the calcium carbonate added as a stabilizer.

By application of Chapter 29 Notes 1(a) and 1(f), the CTC Concentrate is properly classified as an antibiotic in HTSUS heading 2941.[4] At the time of importation, the CTC Concentrate has a general use of making Type A Medicated Articles.[5] These Type A Medicated

---

[4] CBP has acknowledge the application of Chapter Note 1(f) to direct classification of antibiotics mixed with a stabilizer in HTSUS heading 2941.  *See, e.g.*, HRL 967895 (March 16, 2006) (finding that an antibiotic product was a mixture of two organic compounds but was properly classified under HTSUS heading 2941 because the second compound was a stabilizer).) (Ex. 35.)

[5] *See* the DailyMed listing for the CTC Calcium Feed Grade powder and granular products made by Jinhe Biotechnology Co., Ltd. that includes a picture of the approved labels, which clearly state "FOR MANUFACTURING, PROCESSING OR REPACKING ONLY." DailyMed - CHLORTETRACYCLINE FEED GRADE- chlortetracycline calcium powder CHLORTETRACYCLINE FEED GRADE- chlortetracycline calcium granule (last accessed Sept. 19, 2025).

Articles include Aureomycin®, Aureomix® S40/40, AUREO S 700®, and ChlorMax®. (JSUF ¶ 21.) Only after the CTC Concentrate is processed into Type A Medicated Articles, is there a specific use for these drugs to be used as medicine administered through animal feed (Type B or Type C). Because the CTC Concentrate has a "general use" at the time of importation and it comports to requirements under Chapter 29, Note 1 and heading 2941 ENs, it is properly classified in heading 2941.

Assuming the CTC Concentrate has a "specific use" at the time of importation, it would be for use in the manufacture of Type A Medicated Articles, which would direct classification to heading 3003, rather than to heading 2309 as Defendant asserts. (JSUF ¶ 18) (stating that the "CTC Concentrate is not directly fed to animals).) In fact, the CTC Concentrate packaging explicitly states the product is for manufacturing, processing or repacking purposes only. (Ex. 32.)

**B.    The CTC Concentrate Should Only Be Excluded from Heading 2941 if It Is a "Mixture" or "Preparation" as Contemplated by Heading 3003**

It is Plaintiff's position that the subject merchandise is classifiable under heading 2941, an *eo nomine* provision for "antibiotics." The heading 2941 ENs explicitly provide that the scope of this provision includes tetracycline derivatives like chlortetracycline, and the product at issue is exactly that. For the CTC Concentrate to be taken out of this tariff provision, it must be a "preparation" or "mixture" that contains more than allowable impurities and stabilizers. If the Court finds that the product is a "preparation" as asserted by Defendant, then Plaintiff submits that, alternatively, heading 3003 is the correct classification. [6]

---

[6] Defendant also cites *H. Reisman Corp. v. United States*, 17 C.I.T. 1260 (1993) to support its position that the subject merchandise cannot be classified under heading 3003. Defendant's reliance on *Reisman* does not further its position because it involves the classification of an entirely different product. *Reisman* involves the classification of Vitamin B-12, which is produced from vegetable matter, not fungus. *Id.* at 1261. The final product is a brown liquid composed of "approximately 3% vitamin B-12 compounds, 20% proteinaceous matter, 77% water, and trace materials." *Id.* The Vitamin B-12 does not have any component that overlaps with the CTC Concentrate; therefore, the analysis in *Reisman* is not pertinent and should be disregarded.

Defendant plainly states the CTC Concentrate "is 'a single pharmaceutical substance' or API, not a preparation containing an API and an excipient that 'have been mixed together.'" (Def.'s Cross-Mot. at 40.) We note that this is not an errant misstatement in Defendant's brief, as it is repeated throughout the document. (*Id.* at 22 (stating the CTC Concentrate "consists of just *one* constituent—the merchandise itself is the only [sic] API—that is later mixed post-importation with excipients like rice hulls, mineral oil, and calcium sulfate"); *Id.* at 23 ("The merchandise itself is the single pharmaceutical substance or API") (citing JSUF ¶ 6; Ex. 11, Tauren Dep. at 22:24–23:19; PSMF ¶ 26).) Based on this admission and the application of Chapter 29, Note 1, the CTC Concentrate should be classified in heading 2941. For completeness and clarity, we address the alternative classifications below.

III.    **Alternatively, the CTC Concentrate Is a "Medicament . . . Consisting of Two or More Constituents Which Have Been Mixed Together for Therapeutic or Prophylactic Uses" of Heading 3003**

A.    **The CTC Concentrate Consists of Two or More "Constituents" Which Have Been Mixed Together**

　　　i.    *Defendant Admits that the Subject Merchandise Is a "Mixture"*

Despite asserting the CTC Concentrate is an API composed of a single constituent, Defendant argues that the CTC Concentrate is a "preparation," but it cannot be that the product is both a "preparation" and a single constituent. (*See* Def.'s Cross Mot. at 26-27.). Defendant contends that "[t]here is no dispute that the merchandise constitutes a 'preparation'" within the meaning of Heading 2309." (*Id*. at 25.)[7] Yet that position, when understood according to established caselaw, undermines Defendant's contradictory (and incorrect) claim that the subject

---

[7] Defendant also states the CTC Concentrate is a preparation because it "has been specially made up," thereby indicating a particular type of processing. (Def.'s Cross-Mot. at 14.)

merchandise "is just one constituent." (*Id.* at 38.)[8] If the CTC Concentrate is considered to be just one constituent (the API) as Defendant claims, then it is properly classified in heading 2941 as an antibiotic. If, however, the CTC Concentrate is a "preparation" as Defendant also argues, then it is within the scope of heading 3003.[9]

Established caselaw instructs that, for tariff classification purposes, a "preparation" generally "encompasses additional ingredients . . . that do not affect the essential character of the product." *Frosted Fruit Prods. Co. v. United States*, 18 Cust. Ct. 119, 121 (1947); *see also B. Westergaard & Co. v. United States*, 19 C.C.P.A. 299, 300–04 (1932) (concluding that meat balls and fish balls containing vegetable binder were classifiable as prepared meat and prepared fish); *United States v. A. Sahadi & Co. Inc.*, 23 C.C.P.A. 293, 294 (1936) (classifying sheets of dried apricot pulp smeared with olive oil as apricots prepared or preserved rather than fruit paste or pulp). Conversely, the mere freezing of imported fruit—without any additional ingredients—did not make the product a "preparation." *Frosted Fruit Prods. Co.*, 18 Cust. Ct. at 121. Accordingly, a "preparation" is a mixture of more than one substance or constituent. (Ex. 27)

Defendant's assertion that to be a "preparation," a substance need only be "specially prepared, or made up for its appropriate use or application, e.g. as food or medicine …" ignores the critical requirements that a preparation must be made up of more than one ingredient. (Def.'s Cross-Mot. at 25 (citing *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998).) While the decision in *Orlando Food* is informative in providing an example of a

---

[8] Defendant also states, "Nor do the parties dispute that the merchandise contains more than just 'nutritional substances.'" (Def.'s Cross-Mot. at 30.) However, this is not an accurate statement and distorts the facts in this case as there is no agreement that the CTC Concentrate contains any [significant] nutrition whatsoever. (JSUF ¶ 17 (stating that the "CTC Concentrate is not a significant source of nutrients for animals.").)

[9] While Mr. Tauren testified that the CTC Concentrate was not mixed with excipients (*i.e.*, carriers) until after importation, the testimony is clear that the product is mixed with calcium carbonate as a stabilizer before importation. (Def.'s Cross-Mot. at 31 (citing Tauren Dep. 22:24-23:19); Ex. 1, Schroeder Dep. at 47:2-11).)

"preparation," we must understand the facts in that case to fully understand what constitutes a "preparation" for tariff classification purposes.

The product in *Orlando Food* was described as a "canned tomato product consisting of approximately sixty percent whole, peeled tomatoes and forty percent tomato puree by weight, as well as salt, citric acid, and basil leaf." *Orlando Food*, 140 F.3d at 1439. The Federal Circuit found that this product constituted a "preparation" considering that the "term 'prepared' suggests, but does not require, the addition of incidental ingredients that do not affect the essential character of the product." *Id.* at 1441. Based on this guidance, when comparing the headings at issue in this case, an antibiotic "preparation of a kind used in animal feeding" must be a product composed of multiple ingredients beyond the impurities and stabilizers allowed by Chapter 29, Note 1 (as discussed above). Further, regardless of whether the CTC Concentrate may fit within a broad interpretation of the term "preparation" as outlined in the *Orlando Food* decision, this does not mean the product is classifiable in heading 2309 (*i.e.*, Defendant's conclusion is based on the unsupported conclusion that the CTC Concentrate is specially prepared for use as food rather than for use as medicine).

Since, *at the time of importation*, the CTC Concentrate includes multiple substances, including chlortetracycline (the active ingredient) and residual materials from the fermentation manufacturing process that are mixed with calcium carbonate, it consists of "two more or more constituents which have been mixed together." (JSUF at ¶ 23; PSMF ¶¶ 17-18.) Without these multiple substances mixed together, the CTC Concentrate product could not be a "preparation" as Defendant claims. Thus, Defendant's argument that the CTC Concentrate is a "preparation" of just one ingredient must be rejected.[10] If the CTC Concentrate is a preparation as Defendant claims, it

---

[10] Defendant's limited interpretation of the term "mixture" for heading 3003 should be rejected. (Def.'s Cross-Mot. at 31-32.) Regardless, the facts in this case support the conclusion that the CTC Concentrate is a mixture.

can only be because the product is a mixture of more than one substance. If these substances are "two or more constituents which have been mixed together for therapeutic or prophylactic uses," then the good may be classified in heading 3003.

As Defendant did not provide a definition for "constituent," Plaintiff offers the following: a constituent is "[a]n element or part of a compound. Cf. *component* of a mixture." *Austin Chem., Inc. v. United States*, 659 F. Supp. 229, 233 (Ct. Int'l Tr. 1987) (citing *Hackh's Chemical Dictionary* (4th ed. 1969)), *aff'd* 835 F.2d 1423 (Fed. Cir. 1987). The CTC Concentrate is a medicament that was created by the mixture of two constituents, the chlortetracycline (constituent one) and calcium carbonate (constituent two). The heading 3003 ENs, as cited by Defendant are in accord with the above as they specifically include "medicinal ***preparations*** for use in the internal or external treatment or prevention of human or animal ailments. These preparations are obtained by mixing together two or more substances." ENs 30.03 (emphasis added).

### ii.    The CTC Concentrate Is for "Therapeutic or Prophylactic Use"

While Defendant acknowledges that the use of the CTC Concentrate requires VFD approval because the FDA does not recommend the use of certain antibiotics for animal growth, it asserts that simply because the FDA disapproves such use does not mean that it is not actually used in that manner. (Def's Cross-Mot. at 32-34.)[11] Yet, the courts have found certain uses authorized by a federal agency persuasive in matters of tariff classification. For example, this Court has found that the Environmental Protection Agency's ("EPA") designation of a certain product persuasive for purposes of classification. *BASF Corp. v. United States*, 427 F. Supp. 2d 1200 (Ct. Int'l Tr. 2006), *aff'd*, 497 F.3d 1309 (Fed. Cir. 2007). At issue in *BASF* was whether PURADD® FD-100

---

[11] Defendant cites an outdated opinion article in support of this argument. (*See* Def.'s Ex. 1 (published in 2014 and citing a 2011 publication).) Further, Defendant ignores that this article discusses the risks associated with using antibiotics as growth-promoters. This opinion paper predates the relevant FDA guidance at issue in this case. Therefore, the opinion in this article is not persuasive.

was a gasoline additive for purposes of HTSUS heading 3811. This Court determined that the principal use of PURADD FD-100 was a gasoline additive, persuaded by the product's registration with the EPA as a gasoline additive. *Id.* at 1221 ("The evidence presented at trial makes clear that the principal use of PURADD® FD–100 is as an additive for gasoline. For starters, PURADD® FD–100 is registered with the EPA as a gasoline additive, which is a very clear indication that the product is for use in gasoline.").

Similarly, the FDA has restricted the use of CTC Concentrate to "treat[], prevent[], and control of a wide range of respiratory and enteric diseases, such as bacterial pneumonia, bacterial enteritis, anaplasmosis, and other diseases, as well as aiding in the maintenance of weight gain in the presence of disease." (Ex. 22.) Defendant acknowledges this. (*See* Def.'s Cross-Mot. at 18.) The fact that CTC Concentrate can only legally be used for medicinal purposes supports Plaintiff's position that the principal use of the product is therapeutic. Furthermore, even if there were a fugitive use of the CTC Concentrate product for weight gain, that does not undermine the primary purpose, which is for veterinarians to prescribe Type A Medicated Articles made from the CTC Concentrate for use as medicine.[12]

## B.    Heading 3003 Is the Proper Classification when a Preparation Administered in Animal Feed Is Primarily Medicinal

### i.    *Heading 3003 ENs Include the CTC Concentrate as Preparations Containing a Single Pharmaceutical Substance Together with an Excipient, Sweetening Agent, Agglomerating Agent, Support, Etc."*

The heading 3003 ENs clarify that the scope of this heading includes "preparations containing a single pharmaceutical substance together with an excipient, sweetening agent,

---

[12] Defendant ultimately distills its arguments into the unsupported claim that "And the CTC Products are used to treat disease, as well as promote the maintenance of weight gain in the presence of disease, in a herd." (Def.'s Cross-Mot. at 27.) This is false as only two of the identified CTC Products (Ex. 12) made with the imported CTC Concentrate include this claim and is specifically limited to maintenance **when disease is present**, which is significantly different than a general claim for "increasing weight gain" that may be made by other products. (Def.'s Cross. Mot. at 11.)

agglomerating agent, support, etc." (Ex. 29.) An excipient is "any inactive ingredients that are added intentionally to therapeutic and diagnostic products, but that are not intended to exert therapeutic effects at the intended dosage, although they may act to improve product delivery (e.g., enhance absorption or control release of the drug substance)."[13] Thus, this list of additional substances includes a broad array of inactive substances that may be added to the preparation. One constituent of the CTC Concentrate is the calcium carbonate, which is meant to stabilize the active ingredient and could qualify both as a "excipient" and "support." Therefore, the merchandise at issue falls within the scope of heading 3003 as it meets the specific example from the ENs.

    ii.    *Heading 3003 ENs Do Not Exclude the CTC Concentrate Because It Is Not "Solely" for Feeding*

As Plaintiff has already argued, the Explanatory Notes to heading 3003 support classification of the CTC Concentrate under this tariff provision. (Pl.'s Br. at 34-35.)[14] Recent amendments to the ENs provide further clarity on this point. The 2022 Explanatory Notes to heading 3003 provides:

> *Similarly foodstuffs and beverages containing medicinal substances are* **excluded** *from the heading if those substances are added solely to ensure a better dietetic balance, to increase the energy-giving or nutritional value of the product or to improve its flavour, always provided that the product retains its character of a foodstuff or a beverage.*

(emphasis in original). In March 2025, the World Customs Organization ("WCO") amended the Explanatory Notes to heading 3003 to include the following language:

> Similarly, foodstuffs, beverages **and preparations of a kind used in animal feeding containing medicinal substances** are **excluded** from the heading if those substances are added solely to ensure a better dietetic balance, to increase the energy-giving or nutritional value of the product or to improve its flavour, always

---

[13] *See* "Using the Inactive Ingredient Database Guidance for Industry," Federal Food and Drug Administration (July 2019), https://www.fda.gov/media/128687/download (last accessed Sept. 18, 2025).

[14] As Defendant notes, the ENs "are 'generally indicative' of the proper interpretation of a tariff provision" and courts typically give credit to "the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it." (Def. Cross-Mot. at 16 (citing *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008)).)

provided that the product retains its character of a foodstuff, a beverage **or a preparation of a kind used in animal feeding.**

(Ex. 36 (emphasis added).) The amended Explanatory Notes now specifically exclude from heading 3003 preparations of a kind used in animal feeding that contain medicinal substances added solely to ensure a better dietetic balance, to increase energy-giving or nutritional value, or to improve flavor. This characterization does not apply to the CTC Concentrate so this "preparation" is not excluded. While this new language offers a clarification rather than a change in the EN, it does make clear that even if a product may be considered a "preparation of a kind used in animal feeding" it may still be classified in heading 3003.[15]

Furthermore, this language bolsters the position already taken by this Court in *Nutricia N. Am., Inc. v. United States*, which broadly interpreted the scope of exclusions in the pre-amendment headings 30.03 ENs.. 666 F. Supp. 3d 1363, 1370 (Ct. Int'l Trade 2023). For the reasons explained in Plaintiff's Motion and this response, the CTC Concentrate does not meet the criteria of the listed exclusions, i.e., it is not food that contain medicinal substances added solely to ensure a better dietetic balance, to increase energy-giving or nutritional value, or to improve flavor. Therefore, the CTC Concentrate is not excluded from heading 3003 according to this standard. (*See* Pl.'s Br. at 50-51.) When analyzed according to the revised language, the amendment actually bolsters this position because the CTC Concentrate is similarly not a preparation of a kind used in animal feeding. (*See infra* Part IV.)

We recognize that the amended EN language may not technically apply to this case, because the amendment was not in effect at the time the subject entries were filed. *See Wilton*

---

[15] Defendant' arguments focus solely on the ultimate use of the Type C Medicated Feed product made from the Type A Medicated Article that is made with the CTC Concentrate as an ingredient and ignores the established requirements of tariff classification that must be applied to determine the proper classification of this good between headings 2309, 2941, and 3003. Simply because a portion of an imported product may be fed to an animal does not mean it is properly classified in heading 2309.

*Indus., Inc. v. United States*, 493 F. Supp. 2d 1294, 1309-10 (Ct. Int'l Tr. 2007) (rejecting the Government's efforts to apply an amendment to the Explanatory Notes that became effective after importation of goods because importers are entitled to rely on the law in effect at importation). However, the Company continues to import the CTC Concentrate product, so the revised ENs language would apply to current imports. Further, regardless of the revised ENs' guidance, as detailed in Plaintiff's Motion, there is a distinction between goods of heading 2309 and 3003 that focuses on the medicinal nature of such goods.

Even if the amended ENs language applied to this case, it would simply reiterate Plaintiff's position as it clarifies the scope of heading 3003. Foodstuffs and similar preparations that contain medicinal substances are excluded from heading 3003 only if the medicine in the product is "solely" for nutrition/feeding purposes (*i.e.*, better dietetic balance, increase in the energy-giving/nutritional value, flavor improvement). (*See* Pl.'s Br. at 50-51.[16]) That is not the case for CTC Concentrate. The CTC Concentrate product is only made into Type A Medicated Articles (recognized drugs) that are then administered to animals through their feed and only after veterinarian authorization. *See* 21 C.F.R. § 558.6(a)(3) (providing that use and labeling of feed containing a VFD drug is "limited to the approved, conditionally approved, or indexed conditions of use. Use . . . in a manner other than as directed on the labeling (extralabel use) is not permitted."); 21 C.F.R. § 558.6(a)(6) (providing that a feed containing a VFD drug "must prominently and conspicuously display the following cautionary statement: "Caution: Federal law restricts medicated feed containing this veterinary feed directive (VFD) drug to use by or on the order of a licensed veterinarian."); 21 C.F.R. §558(b) (providing the responsibilities of the veterinarian

---

[16] The government completely ignores this argument and does not address this limiting language found in the heading 3003 ENs.

issuing the VFD as well as the many requirements for a valid VFD.) Any nutrition related benefits that may occur from the use of CTC Concentrate at the time an animal is eating its food ration is purely incidental and is not the reason such a potent drug product is purchased for further processing.[17]

The CTC Concentrate is specifically manufactured for use as medicine and its primary component is chlortetracycline, a recognized antibiotic. Defendant's statement that "[t]he remainder of the subject merchandise, chemically speaking, is largely protein" is inaccurate and unsupported. (Def.'s Cross-Mot. at 16.) As stipulated by the parties, the CTC concentrate consists of "mycelial cake, microbial cells, residual nutrients, other fermentation components, and metabolic products" with calcium carbonate added. (Ex. 2.) Any components other than the chlortetracycline are inactive and not important to the product's use as medicine.

Each batch of CTC Concentrate has a different final concentration of the listed ingredients based on the final fermentation result. Fermentation is not an exact science and external influences can impact the efficiency of fermentation and thus the amount of chlortetracycline created in each fermentation batch. (Ex. 1, Schroeder Dep. 34:3-6.)  This in turn will impact the content of other materials in the CTC Concentrate and is why the contents are identified in ranges. (Ex. 2.) Once the fermentation process is stopped and water is removed, the remainder of ingredients of the CTC Concentrate can be determined or calculated. The amount of these other ingredients will vary with the primary goal being the chlortetracycline falls within the ranges listed in the table.

---

[17] The government acknowledges that "[a]ntibiotics are included in animal feed through non-nutritive feed additives." (Def.'s Cross-Mot. at 3 (*citing* Def.'s Ex. 2 (May 1992).) This document states that "Feed additives have no nutritional value in and of themselves. However, they are included in trace amounts to counteract illness, promote growth, or improve the physical and sensory characteristics of the primary feed ingredients." (*Id.* at 127.) This document references certain "major producers of animal drugs," including Pfizer, which was Zoetis's former parent company.

The "Amount" of "Protein" in the CTC Concentrate is listed as "35 – 40% Max." This is not the actual amount of protein in the subject CTC Concentrate, but instead indicates the amount of protein that may be present in an acceptable product. CTC Concentrate could have zero protein (i.e., the chlortetracycline could be distilled to its most pure crystalline form) and still be useful for its intended purpose as an antibiotic to treat, control, and prevent animal disease. The critical component of the CTC Concentrate is the chlortetracycline content, which is essential to its ultimate use. The CTC Concentrate, once converted to a Type A Medicated Article that is then incorporated into a Type C Medicated Feed, would be present in an animal's food ration in a miniscule amount (*i.e.*, a microingredient in the feed) and provide negligible nutrition (if any), but would be responsible for 100% of the antibiotic requirement for the animal. In other words, the CTC Concentrate product is designed to deliver medicine, not nutrition.

Defendant's assertion that proteinaceous material in the CTC Concentrate "is deliberately left in" for a nutrition purpose is not correct and is unsupported by the record. (Def.'s Cross-Mot. at 43.) Further, Defendant's claim that the protein "constitutes over 75 percent of the merchandise," is similarly incorrect. (Def.'s Cross-Mot. at 43-44.) Finally, Defendant's claim that the CTC Concentrate "is solely used to make premixes for animal feed" is also wrong. (Def.'s Cross-Mot. at 443; (JSUF ¶ 20) (CTC Concentrate is used to make Type A Medicated Articles which are recognized drugs).) Any residual materials from the fermentation process are left in the CTC Concentrate as a result of manufacturing convenience and to stabilize the product for its future use in making specific drug products. (Ex. 1, Schroeder Dep. 47:22-24 ("But that is why we have, instead of just CTC, we've got the CTC Concentrate mycelial cake, because it is more stable instead of just CTC crystallin.").)

Beyond the lack of support for Defendant's argument, the parties have stipulated that "CTC Concentrate is not a significant source of nutrients for animals." (*See* JSUF ¶17.) If the product is not a significant source of nutrients, then it cannot be a foodstuff or preparation of a kind used in animal feeding containing medicinal substances added solely to ensure a better dietetic balance, increase nutritional value, or provide energy. To suggest otherwise is inherently contradictory. In contrast, the chlortetracycline in the CTC Concentrate is the primary component of this product and is present solely for its medicinal properties.

There are preparations of a kind used in animal feeding that contain medicine that is added solely for nutrition-related purposes and these can be contrasted with CTC Concentrate and Type A Medicated Articles made therefrom. Consider, for example, Flavomycin (bambermycins), which is an antibiotic and Type A Medicated Article available solely for animal nutrition and improved growth performance.[18] The language of the heading 3003 ENs exclusion may contemplate products like Flavomycin that is solely for animal nutrition, but not CTC Concentrate that prevents, controls, and treats the animal against a multitude of diseases.

## C.     WCO Compendium Decisions Support Classification of Preparations of a Kind Used in Animal Feeding Under Heading 3003

As discussed above, the amendment to the 3003 ENs explicitly states that preparations of a kind used in animal feed containing medicinal substances are only excluded from this heading if the medicinal substance is **<u>solely</u>** added for feeding-related purposes (i.e., better dietetic balance, nutritional value increase, flavor improvement). This implies that such preparations remain in heading 3003 when the medicinal substance is **not** solely for feeding-related purposes.[19] WCO

---

[18] *See* FLAVOMYCIN® 4 (bambermycins) – Huvepharma (last accessed Sept. 10, 2025); DailyMed - Search Results for BAMBERMYCINS TYPE A MEDICATED ARTICLE (last accessed Sept. 10, 2025).

[19] *See* Def's Cross-Mot. at 51 (stating that the court could have "concluded that the explanatory notes are most persuasive where the subject merchandise is specifically described therein") (citation omitted).

compendium decisions that predate the heading 3003 ENs amendment support this interpretation. While WCO compendium decisions are not binding, they have been deemed persuasive. *Cummins Inc. v. United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006) (stating that while a WCO "opinion is not given deference by United States courts, it can be consulted for its persuasive value, if any.")

The WCO has issued two compendium decisions classifying preparations for use in animal feeding under HS subheading 3003.20.[20] These products are described as follows:

> Preparation for use in animal feeding to prevent coccidiosis in broiler chickens caused by Eimeria spp. The preparation is presented in the form of free-flowing powder composed of maduramicin ammonium (maduramicin as ammonium salt) (0.75 %), nicarbazin (8 %) (active ingredients) and corn cob (carrier). It is packaged in 25 kg bags and must be mixed into feed at a dosage of 500 g per tonne of feed.

> Preparation for use in animal feeding for the prevention and control of coccidiosis in broiler chickens caused by Eimeria spp. The preparation is presented in the form of white to off-white powder composed of robenidine hydrochloride (10 %) (active ingredient) and calcium carbonate (carrier). It is packaged in 25 kg bags and must be mixed into feed at a dosage of 350 to 500 g per tonne of feed.

(Ex. 34, WCO 64th Session, NC2692E1b/P/3).) These WCO Compendium decisions were issued based on a request submitted by the Philippines asserting that the identified products were properly classified in HS subheading 2309.90. (Ex. 37, WCO 64th Session, NC477E1a.) The WCO disagreed. (*Id*.)

First, the WCO noted that headings 2309, 2941, and 3003 must all be considered for the classification of these products. (*Id*.) The WCO found persuasive that both preparations required a "veterinary prescription and that the product must not be fed to birds which are producing eggs for human consumption." (*Id*.) The WCO reasoned that "[v]eterinary preparations . . . would normally be used for a limited period only." (*Id*.) The WCO also considered the quantity of the

---

[20] The WCO issues the Compendium of Classification Opinions that "includes a list of the most significant/difficult classification decisions taken by the Harmonized System Committee. The Classification Opinions . . . carry the same status as the Explanatory Notes, but refer to specific products." World Customs Organization (last accessed Sept. 19, 2025).

active ingredient reasoning that a small amount would suggest that it is not a preparation for veterinary use. (*Id.*) Since these products contained a large amount of medicine, the WCO concluded that the preparations were a medicament consisting of two or more constituents which have been mixed together for therapeutic or prophylactic uses. (*Id.*; *see also* Ex. 43, WCO 64th Session, NC2691B1b.)

The two preparations described above are similar to the CTC Concentrate and are also administered through Type C Medicated Feed, just like the CTC Concentrate. While the product names are not explicitly identified in the WCO Harmonized Committee meeting notes, the first preparation contains nicarbazin which is an antibiotic used in the treatment or prevention of coccidiosis.[21] It is combined with maduramicin ammonium (a polyether ionophore antibiotic from fermentation), which results in a Type A Medicated Article.[22] Feed products on the market containing a combination of nicarbazin and maduramicin ammonium include products from Arshine Feed and other feed manufacturers.[23] We note that while this drug is utilized to treat coccidiosis, it can also result in weight gain for chickens.[24]

Similar to the first preparation reviewed by the WCO, robenidine, is a synthetic chemical anticoccidial (non-antibiotic) used in the treatment or prevention of coccidiosis.[25] After chemical synthesis, robenidine hydrochloride is formulated into a Type A Medicated Article by mixing

---

[21] *See* Nicarbazin | C19H18N6O6 | CID 9507 - PubChem (last accessed Sept. 10, 2025).

[22] *See* Nicarbazin 8%+ Maduramycin 0.75% – AGP alternatives,Anticoccidials,Antibiotic substitutes—Phiphar healthcare limited (last accessed Sept. 19, 2025).

[23] *See* Efficient & Professional Supplier of Feed Additives; CN103479658A - Maduramicin ammonium nicarbazin premix and preparation method thereof - Google Patents (last accessed Sept. 10, 2025).

[24] *See* Nicarbazin - an overview | ScienceDirect Topics (last accessed Sept. 10, 2025).

[25] *See* Robenidine | C15H13Cl2N5 | CID 9570438 - PubChem (last accessed, Sept. 10, 2025).

(6.6% API in U.S.) with a carrier that is suitable for incorporation into feed.[26] Products on the market containing robenidine hydrochloride (6.6%) include Robenz (Zoetis/Phibro Animal Health). (*See* Daily Med - https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=f86501dd-61c8-451b-ad5e-562e349fbd37.)[27]

Like the preparations reviewed by the WCO and classified under heading 3003, the CTC Concentrate contains an active ingredient (chlortetracycline antibiotic) and is used to produce a Type A Medicated Article that is later administrated to animals through Type C Medicated Feed. It is used to treat, control, or prevent an assortment of diseases, identical to the preparations in the WCO compendium decisions. While Defendant focuses its analysis on the fact that the CTC Concentrate may have secondary benefits such as weight gain, beyond its medicinal qualities, the WCO's reasoning demonstrates that such a secondary use does not undermine classification under heading 3003. Further, this secondary use is not authorized in the U.S., so is not a proper consideration for classification of the CTC Concentrate. (*See supra* pp. 19-20; Pl.'s Br. at 23.) Rather, because the CTC Concentrate's potency exceeds even that of the preparations identified above, and because it also requires a veterinarian's authorization for use (for a limited duration), as the WCO has noted in its compendium decisions, this necessitates classification of the CTC Concentrate under heading 3003.

For contrast, we note that the WCO has recently issued compendium decisions (in March 2025) for certain preparations containing a coccidiostat that were classified under HS subheading

---

[26] *See* Robenz® (last accessed Sept. 10, 2025).

[27] *See* Hexarobin Poultry Feed Additives, Packaging Type: HDPE Bag, Granules at ₹ 90/kg in Hyderabad (last accessed Sept. 10, 2025); Robenidine Hydrochloride Premix 10% Coccidiostat for Poultry Rabbit Sheep Cattle Factory GMP - Robenz and Cycostat 66g (last accessed Sept. 10, 2025).

2309.90.[28] These more recent decisions further illustrate why the subject CTC Concentrate cannot be classified under Defendant's preferred classification. The three products classified by the WCO under HS subheading 2309.90 are described as follows:

> Preparation used in animal feeding, in granular form, composed of corn, wheat, soybean extraction meal, sunflower extraction meal, triticale, a mixture of milling by-products, peas, wheat bran, soybean oil, calcium carbonate, spent grain, dicalcium phosphate, sodium chloride, sodium bicarbonate, nutritional additives (vitamins, trace elements), zootechnical additives and a coccidiostat (monensin sodium (E757)), put up in 25 kg bags. The product contains 120 mg/kg of monensin sodium. The preparation is used for the rearing of chickens; it is freely available to them from day one and for the following 6 to 12 weeks, depending on weight development and coccidiostat requirements.

> Preparation used in animal feeding, in powder form, composed of protein deficient soybean meal (992.5 g/kg), a coccidiostat (diclazuril, 5 g/kg) and processing aids (2.5 g/kg), put up in 20 kg bags. The preparation is used for the rearing of chickens and must be mixed with feed (200 g per tonne of feed).

> Preparation used in animal feeding, in powder form, composed of wheat flour (700 g/kg), calcium carbonate (280 g/kg), starch (15 g/kg) and a coccidiostat (diclazuril, 5 g/kg), put up in 20 or 25 kg bags. The preparation is used for the rearing of chickens, turkeys, guinea fowl, rabbits or pheasants and must be mixed with feed (160 to 240 g per tonne of feed).

(Ex. 33.)

These preparations are distinctive from those classified under subheading 3003.20 (*i.e.*, preparations primarily used for the treatment and prevention of diseases) for multiple reasons. First, they are primarily used in "rearing" of animals and contain a significant amount of ingredients that are beneficial for nutrition and growth of the animal like corn, wheat, peas, flour, etc. Further, use in "rearing" indicates a product that is freely administrable and assists with the growth of the animal. This aligns with the requirements in heading 2309 that a product (or premix as in these cases) be for nutritional purposes. Second, the amount of active pharmaceutical ingredient (API) in these three preparations (premixes) are relatively small. The CTC Concentrate

---

[28] Like the revised ENs language, these decisions may not technically apply to this case because they were not in effect at the time the subject entries were filed, but we believe they are useful guidance for the Court's consideration.

is distinguishable from these preparations classified under subheading 2309.90. For example, CTC Concentrate contains no vegetable or feed stuff based ingredients common in premixes. (*See* Pl.'s Br. at 54-55.) Thus, we assert these the WCO opinions further support Plaintiff's requested classification of CTC Concentrate under heading 3003.

**IV.    The CTC Concentrate Is Not a "Preparation" Classifiable in Heading 2309**

Because the CTC Concentrate is properly classified under heading 2941—or, alternatively, heading 3003—the Court need not reach the Defendant's argument that it falls under heading 2309, a basket provision. However, even if the Court were to entertain Defendant's analysis, it must conclude that the CTC Concentrate is not properly classified in heading 2309 because it is not a "preparation" contemplated by this heading.

**A.    CTC Concentrate Is Not the Class or Kind of Goods Covered by Heading 2309**

Defendant's position in this case relies heavily on a selective reading of the Explanatory Notes. Specifically, it claims that "Explanatory note 23.09 provides that an antibiotic product virtually indistinguishable from Zoetis's is classifiable under heading 2309." (Def.'s Cross-Mot. at 22.) This assertion, however, is contradicted by facts that both parties agree are material.

*i.    The CTC Concentrate Is Not a "Complete" or "Supplementary" Feed.*

Defendant's argument presupposes that the product is either a "complete feed," a "supplementary feed," or a "preparation for use in making the complete feeds or supplementary feeds." (Ex. 27.) Crucially, however, both parties agree that "[t]he CTC Concentrate is not a . . . 'complete feed,' or 'supplementary feed.'" (JSUF ¶ 15.) To qualify as a "complete feed," a product must contain energy nutrients (such as cereals), body-building nutrients (such as leguminous vegetables), and functional nutrients (such as vitamins). (Ex. 27.) Similarly, "supplementary feeds" "have much the same composition as" complete feeds but are "distinguished by a relatively high

content of one particular nutrient." Yet the parties have stipulated that "CTC Concentrate is not a significant source of nutrients for animals" and "is not directly fed to animals." (JSUF ¶¶ 17-18.)

    *ii.*    *The CTC Concentrate Is Not a "Premix."*

In addition to complete feed or supplementary feed, heading 2309 applies to certain "preparations" that are used in animal feeding, but heading 2309 does not cover all preparations that are ultimately fed to animals. Although Defendant asserts "[t]here is no dispute that the merchandise constitutes a 'preparation'" (Def.'s Cross-Mot. at 25), this cannot be the end of the inquiry for determining the proper classification of the CTC Concentrate. That is because the CTC Concentrate may be a preparation and not be classified in heading 2309.

Generally, the heading 2309 ENs provide that the preparations containing medicinal substances that are classified in heading 2309 are known as "premixes." (Pl.'s Ex. 27.) Thus, for the purposes of the application of heading 2309 to the CTC Concentrate, "preparations" and "premixes" should be considered synonymous. Critically, the parties have expressly agreed that the "CTC Concentrate is not a 'premix.'" (JSUF ¶ 15.) Therefore, the CTC Concentrate cannot be considered a preparation under heading 2309. This point alone should be dispositive.

Defendant nevertheless attempts to recast the CTC Concentrate as a "substance" or "additive" of a premix. (*See* Def.'s Cross-Mot. at 26-27.) This does not help Defendant's position as heading 2309 does not cover individual ingredients or additives but rather "*compound compositions* consisting of a number of substances." (Ex. 30 (emphasis added).) The heading's scope is specifically limited to combined products (*i.e.*, "preparations")—not their separate components.

Defendant identifies the CTC Products are feed additives. (Def.'s Cross-Mot. at 10.) A "feed additive" is an "[i]ngredient or combination of ingredients added to the basic feed mix or its parts to fulfill a specific need. Usually used in micro-quantities and requires careful handling and

mixing." (Def.'s Ex. 3 at 157.) Feed additives include "urea, minerals, vitamins, and amino acids," which "are commonly added to feed mixtures to correct nutritional deficiencies of the basic livestock ration." (Def.'s Ex. 2 at 114.) "Feed additives have no nutritional value in and of themselves." (*Id*. at 127.) Drugs, such as the Type A Medicated Articles made from the CTC Concentrate are considered "nonnutritive feed additives." (*Id*.) Antibiotics, like the CTC Concentrate, are a type of drug ingredient that is also considered to be a "nonnutritive feed additive." (*Id*. at 128.)

"Drug" is defined as "A substance (1) intended for use in the diagnosis, cure, mitigation, and treatment or prevention of disease in man or other animals, or (2) a substance other than food intended to affect the structure or any function of the body of man or other animals." (Def.'s Ex. 2 at 153; Def.'s Ex. 3 at 149, Def.'s Ex. 6 at 357.) The parties agree the CTC Concentrate is a drug. (JSUF ¶¶ 6-7; *see also* PSMF ¶ 1 and Def.'s SOF ¶ 6.) By definition, this drug product does not fall within the scope of heading 2309—*i.e.*, it is not food. Instead, its use and composition falls squarely within the scope of heading 2941 or heading 3003.

We disagree that "[t]he explanatory note clarifies that heading 2309 covers microingredients used to make premixes for animal feed—in particular, antibiotics like Zoetis's." (Def.'s Cross-Mot. at 26.) Instead, these ENs specifically exclude the CTC Concentrate and direct this product to heading 3003 if it is a preparation (mixture of more than one constituent) or heading 2941 if it is just one constituent (the antibiotic API) as Defendant argues. (*See* Ex. 27.) The CTC Concentrate is not any of the examples in the heading 2309ENs—not complete feed, not supplementary feed, not premixes. (JSUF ¶ 15.) Further, the CTC Concentrate contains only trace amounts of nutrients. (*Id.* ¶ 17; PSMF ¶ 17.)

    *iii.*     *The CTC Concentrate Does Not Contain a "Carrier" at Time of Importation.*

Even if the CTC Concentrate were considered a "premix" (which it is not), it does not contain a "carrier" at importation. Defendant notes that a premix is a preparation "combined" with a "carrier." (Def.'s Cross-Mot. at 11; *see also* Ex. 27.) A "carrier" is typically defined as "[a]n edible material to which ingredients are added to facilitate uniform incorporation of the latter into feeds. The active substances are absorbed, impregnated or coated into or onto the edible materials in such a way as to physically carry the active ingredient." (Def.'s Ex. 6 at 355; Def.'s Ex. 3 at 144 (stating that a diluent "may also be a carrier"); Def.'s Ex. at 152.)

Typically, rice hulls, calcium sulfate, limestone (source of addition calcium carbonate), mineral oil, or lecithin are added to the CTC Concentrate after importation as "carriers." (Ex. 1, Schroeder Dep. 46:17-47:11; JSUF ¶ 23; Def.'s SOF ¶ 3.) While calcium carbonate is recognized as a carrier for pharmaceutical products, it is not added to the CTC Concentrate as a carrier before importation, instead it is added as a stabilizer or reagent (impurity). (*See* Pl.'s Br. at 31 (explaining that calcium carbonate is a recognized reagent).) The purified calcium carbonate is added for the distinct purpose of reacting and forming a CTC-calcium complex which instills chemical stability (and allows the residual mycelial cake components to remain as part of the final CTC Concentrate) for further processing into Type A Medicated Articles. (Ex. 1, Schroeder Dep. 13:20-23; 46:17-47:11.)

This is legally significant. It is axiomatic that "[t]he classification of imported items is determined by their condition at the time of entry." *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006) (citing *Austin Chem. Co. v. United States*, 835 F.2d 1423, 1426 (Fed. Cir. 1987)). Since the CTC Concentrate does not have a carrier added at the time of importation (among other reasons), it is not a "premix" as contemplated by heading 2309. The post-importation addition of carriers is irrelevant to the classification analysis of this product.

Finally, even if the calcium carbonate were considered a "carrier" in the CTC Concentrate (it is not), we see from the WCO Compendium decisions above that preparations with a carrier may still be classified in heading 3003.

    *iv.*    *The Government Misinterprets the Meaning of "Preparations for Veterinary Use"*

Defendant also misinterprets the heading 2309 ENs' warning that "[t]he preparations of this group should not . . . be confused with certain preparations for veterinary uses." (Pl.'s Ex. 27.) While acknowledging that the CTC Concentrate "is ultimately used under veterinary oversight," Defendant argues it is not "used" by veterinarians because "it is generally not sold by veterinarians, who are on the sidelines of the animal-feed process." (Def.'s Cross-Mot. at 28.) This conflates "preparation for veterinary uses" with "preparation for use by a *veterinarian*." The text of the ENs does not support such a restrictive interpretation.[29]

The plain meaning of the phrase "veterinary uses" refers to products intended to treat, control, prevent, or manage disease or health conditions in animals, irrespective of who ultimately administers them. Had the HTSUS drafters intended for this phrase to refer only to products that were administered by *veterinarians*, they could have easily chosen those words, rather than the broader phrase "veterinary uses."[30] Additionally, Defendant's claim that veterinarians are "on the sidelines" ignores the reality of modern agriculture, where veterinarians routinely prescribe and

---

[29] Further, Defendant's attempt to diminish the veterinarian's role in the feeding of the products made with the CTC Concentrate to animals is unavailing and unpersuasive. Defendant acknowledges that the chlortetracycline in the CTC Concentrate and products made from this imported material will not be fed to animals without the intervention and direction of a veterinarian. (JSUF ¶ 30.) Moreover, the record explains the veterinarian's role in the process and why they are necessary. (*See* Ex. 1, Schroeder Dep. at 27:17-23, 29:11; Def.'s Ex. 4, Schluender Dep. at 36:20–37:2.)

[30] *Compare* Veterinarian, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/veterinarian (last accessed Aug. 21, 2025) ("a person qualified and authorized to practice veterinary medicine ("a person qualified and authorized to practice veterinary medicine") *with* Veterinary, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/veterinary (last accessed Aug. 21, 2025) ("of, relating to, practicing, or being the science and art of prevention, cure, or alleviation of disease and injury in animals and especially domestic animals.").

supervise feed-grade medications, including antibiotics. It is undisputed that the product at issue "require[s] a veterinary feed directive (VFD) issued by a licensed veterinarian" in order to be fed to animals. (JSUF ¶ 30.) This underscores deliberate and necessary veterinarian involvement in the use of the subject product as it is ultimately administered to animals.

The fact that feed distributors or mills may handle the actual mixing and delivery of the animal feed made with CTC Products containing the CTC Concentrate does not diminish the restricted and controlled nature of the intended use. Just as a physician's prescription in human medicine defines the medical use of an antibiotic, a veterinarian's oversight and therapeutic intent define the CTC Concentrate as a preparation for "veterinary uses." Defendant's narrow reading is unsupported by the text of the ENs, inconsistent with industry practice, and contrary to the functional role of veterinarians in the use of chlortetracycline in Medicated Feeds.

This approach is no different than a doctor that prescribes medicine that is ultimately ingested by a patient. The doctor's interaction is not with the pharmaceutical company, but with the patient that receives the prescription and takes it to a pharmacy to be filled. These prescribed drugs might be taken by mouth with or in food. Under Defendant's logic, such medicinal products would be classified as feeding preparations and not as medicaments.

Further, contrary to Defendant's contention (Def.'s Cross-Mot. at 12), the Type A Medicated Articles made with the CTC Concentrate are administered in specific dosage. (*See* Exs. 38-41[31] (drug labels showing amount of medicated article per ton).) It is true that the imported

---

[31] These drug labels are available at <u>DailyMed - AUREOMYCIN 90 MEAL- chlortetracycline hydrochloride granule</u> (last accessed Sept. 19, 2025); <u>DailyMed - AUREOMYCIN- chlortetracycline hydrochloride granule</u> (last accessed Sept. 19, 2025); <u>DailyMed - AUREOMIX S 40/40 GRANULAR- chlortetracycline and sulfamethazine granule</u> (last accessed Sept. 19, 2025); <u>Aureo S 700® Granular</u> (last accessed Sept. 19, 2025); <u>DailyMed - CHLORMAX 50- chlortetracycline granule</u> (last accessed Sept. 19, 2025). The Court may take judicial notice of information published on a government website. *See Klamath Claims Comm. v. United States*, 541 F. App'x. 974, 979 n.8 (Fed. Cir. 2013) (explaining that government records may be "judicially noticed"); *Chae v. Yellen*, 579 F. Supp. 3d 1343, 1357 (Ct. Int'l Tr. 2022).

product is in bulk form, which is why it would be classified in heading 3003, but that does not diminish the reality that the use of chlortetracycline in animal feed is strictly controlled. Thus, Defendant's arguments about the method of distribution and administration of the Type A Medicated Articles made with the CTC Concentrate are inapposite and irrelevant.

Finally, the Government's interpretation not only conflicts with the structure and logic of the Explanatory Note—which cautions against confusing preparations for use in animal feeding with those intended for therapeutic purposes—but also overlooks the express exclusion of "other products in Chapter 29" and "medicaments of heading 30.03" from heading 2309. Since the CTC Concentrate is properly classified in heading 2941 or, alternatively, heading 3003 (for the reasons discussed above and in Plaintiff's Motion for Summary Judgment, the heading 2309 ENs specifically exclude this product from classification in heading 2309.

## B.    Heading 2309 Is a Basket Provision

Beyond the substantive reasons why the CTC Concentrate does not meet the classification criteria under heading 2309, it is further excluded from classification in this tariff provision by Chapter 23, Note 1, which restricts this heading to "products of a kind used in animal feed, not elsewhere specified or included." HTSUS Ch. 23, Note 1. This language unmistakably marks heading 2309 as a classic basket provision, which "only applies in the absence of another applicable heading." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1358 (Fed. Cir. 2014).

Defendant contends, in a strained reading of Chapter 23, Note 1[32] that "[b]y using the word 'includes,' the HTSUS's drafters thus made clear that note 1 is not a limitation on heading 2309's scope." (Def.'s Cross-Mot. at 37.) However, the language of Chapter 23, Note 1 must be read as a

---

[32] The full note states, "Heading 2309 includes products of a kind used in animal feeding, not elsewhere specified or included, obtained by processing vegetable or animal materials to such an extent that they have lost the essential characteristics of the original material, other than vegetable waste, vegetable residues and byproducts of such processing." (Ex. 30.)

whole. While the word "includes" may suggest broad coverage, its scope is expressly and categorically limited by the language "not elsewhere specified or included" immediately following. This crucial limitation means heading 2309 functions as a basket provision and is applicable only to products that can be used in animal feeding and are not covered by a more specific heading elsewhere in the tariff schedule. This limiting language is identical to language in the 2309 ENs with the exception of the "not elsewhere specified or included" language. Thus, accepting Defendant's position would require the Court to disregard entirely the exception for products "not elsewhere specified or included" that appears in the statutory language and not the ENs. *See, e.g., Archer Daniels Midland Co. v. United States*, 561 F.3d 1308, 1315 (Fed. Cir. 2009) ("Although we recognized that the Explanatory Notes may be generally useful as guides to the scope of unclear HTSUS headings, they are not legally binding. Thus, when the language of the tariff provision is unambiguous and the Explanatory Notes contradictory, we do not afford the Explanatory Notes any weight.") (cleaned up).

Further, disregarding the limitation established by Chapter 23, Note 1 would be contrary to binding precedent, which holds that "not elsewhere specified or included" is the hallmark of a basket provision. *R.T. Foods, Inc.*, 757 F.3d at 1354 (citing *Int'l Bus. Machs. Corp. v. United States*, 152 F.3d 1332, 1338 (Fed. Cir. 1998)); *see also BASF Corp. v. United States*, 778 F. Supp. 3d 1367, 1373-74 (Ct. Int'l Tr. 2025) (Laroski, J.) ("A tariff subheading is considered a 'basket' provision when it is applicable to goods 'not elsewhere specified or included.'" (citing *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002)). As the Federal Circuit has explained, the effect of this language is that "any products that are 'specified or included' in another tariff heading cannot be classified in [the basket provision]." *R.T. Foods, Inc.*, 757 F.3d at 1354; *see also BASF Corp.*, 778 F. Supp. 3d at 1374 (Laroski, J.) ("The classification of imported

31

merchandise in a basket provision 'is only appropriate when there is no tariff category that covers the merchandise more specifically.'") (quoting *EM Indus., Inc. v. United States*, 999 F. Supp. 1473, 1480 (Ct. Int'l Tr. 1998)). Therefore, even if a product generally fits the description of "preparations of a kind used in animal feeding," it cannot be classified under heading 2309 if it is specifically provided for in another heading. The Court should therefore recognize that the scope of heading 2309 is not all-encompassing, but is expressly restricted, in accordance with the foundational tariff principle that specific provisions prevail over general ones.

Defendant also argues that heading 2309 cannot be a basket provision because such an interpretation would contradict EN 23.09(II)(c)(b). (*See* Ex. 27.) On the contrary, interpreting heading 2309 as a basket provision is entirely consistent with the structure of the Explanatory Notes. EN 23.09(II)(c)(b) distinguishes between "basic material" used in preparing "premixes" and preparations for veterinary use, such as the CTC Concentrate. (*Id.*)[33] The express exclusion of medicinal preparations supports the interpretation that heading 2309 is intended to be a catchall provision for generic preparations obtained by processing vegetable or animal materials that are used in animal feed and not for antibiotic preparations that are primarily medicinal in nature like the CTC Concentrate. Such products belong in heading 3003 if a mixture or in heading 2941 if solely the antibiotic (with allowed impurities).

This interpretation is also consistent with the principle of statutory construction in customs law, which requires that tariff terms be construed according to their common and commercial meanings unless specifically defined. *See, e.g., Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The deliberate use of basket provisions such as heading 2309 within

---

[33] Similarly, Defendant's claim that the heading 2309 ENs only exclude "'dosage products' like injectable antibiotics, not antibiotics ultimately included in animal feed" is similarly without merit. (Def.'s Cross-Mot. at 14.) Further, as discussed herein, the Type A Medicated Articles made with CTC Concentrate are administered to animals in specific amounts for specific amounts of time and, therefore, are also properly considered to be dosage products.

the HTSUS reflects Congress's intent to avoid redundancy and ensure that more specific headings take precedence over general or residual provisions. *See Metchem, Inc. v. United States*, 441 F. Supp. 2d. 1269, 1272 (2006) ("[T]he HTSUS is not designed so that the headings overlap."), *aff'd*, 513 F.3d 1342 (Fed. Cir. 2008). Reading heading 2309 too broadly would undermine this legislative intent and the coherence of the tariff classification system.

Moreover, a broad interpretation of heading 2309 risks creating overlap and classification conflicts within the tariff schedule. Products such as pharmaceuticals, chemicals, or veterinary medicaments may share some characteristics with preparations used in animal feeding because they are ultimately fed to an animal, but such products are specifically provided for in other chapters, including HTSUS Chapters 29 and 30. Adhering to the "not elsewhere specified or included" limitation preserves the integrity of the tariff schedule and avoids such conflicts.

Finally, the Harmonized Tariff System is designed to promote international harmonization and predictability, as reflected in the WCO's Explanatory Notes. These notes consistently treat basket provisions as residual catchalls for goods not covered elsewhere, and interpreting heading 2309 in harmony with this guidance promotes uniformity in international trade. Limiting heading 2309 to animal feeding preparations "not elsewhere specified or included" also provides clarity and certainty to importers, ensuring predictable classification outcomes and reducing the risk of inconsistent customs decisions. (*See supra* Parts B.ii and C.)

For the reasons cited above (*supra* Parts II-III), the CTC Concentrate is more specifically provided for in either heading 2941 or heading 3003.[34] Accordingly, as a basket provision, the

---

[34] Contrary to Defendant's assertion, it is heading 3003 that is more specific and has the requirements that are more difficult to satisfy. (*Compare* Def's Cross-Mot. at 32-33, *with* Pl.'s Br. at 59.) First, heading 2309 is a residual provision that will only cover an antibiotic preparation if it is not covered more specifically elsewhere in the tariff schedule. While heading 2309 broadly covers preparations used in animal feeding (not specified or included elsewhere) that may include preparations that contain antibiotics, heading 3003 only applies to antibiotic preparations that may be administered through feed that are medicinal in nature. This is a more specific tariff provision.

express terms of Chapter 23, Note 1 dictate that the CTC Concentrate cannot be classified in heading 2309.

**V.    The Legal Analysis and Factual Determinations of HRL H325604 Should Be Given Deference**

Defendant's Motion summarily dismisses Plaintiff's arguments concerning deference to CBP's decision in HRL H325604 even though Defendant acknowledges "Customs classified what is essentially the same product as the subject merchandise under heading 2941." (Def.'s Cross-Mot. at 44.) Although we agree that Customs rulings are not binding on the Court, we disagree that the analysis and conclusions in HRL H325604 should not be considered in this case. (*Id.* at 45.) (arguing "HQ H325604's conclusions as to the feed grade chlortetracycline concentrate are simply wrong as a matter of law and should not be considered persuasive.").

First, Defendant does not explain why HRL H325604 is not persuasive. Legal precedent instructs that "the persuasiveness of a Customs classification ruling," depends on "the writers' thoroughness, logic, and expertness, [the ruling's] fit with prior interpretations, and any other sources of weight." *Mattel, Inc. v. United States*, 346 F. Supp. 2d 1295, 1311 (Ct Int'l Tr. 2004) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)).

The thoroughness factor is clearly met as the fifteen (15) page ruling analyzes the very same authorities that Defendant analyzes in its cross-motion for summary judgment. Thus, there appears to be no argument that the ruling failed to consider binding or important sources of law. On the contrary, and as pointed out in Plaintiff's Motion, the lengthy ruling thoroughly analyzes the subject product, the language of the competing tariff headings, the relative section and chapter notes, and the applicable Explanatory Notes. (*See* Pl.'s Br. at 38-40.)

Interestingly, Defendant does not challenge the logic of HRL H325604, which carefully evaluated the factual indicators that led CBP to conclude that the CTC Concentrate is excluded

from Chapter 23. Instead, Defendant only claims that it did not have all the facts—but fails to state what it missed between the ruling review and the record developed in this case. (Def.'s Cross. Mot. at 45.) For example, CBP noted that the product is not a complete or supplementary feed because it "do[es] not provide any substantial source of nutrients in the diet of the animal." (Ex. 9, HRL H325604 (Aug. 31, 2023) at 12.) CBP also noted that the "percentage of the active ingredient, [CTC], exceeded the range described in the ENs to heading 2309." (*Id.*) Further, CBP found "the subject product[] [is] manufactured for veterinary use." (*Id.*) All these facts are accurate and relevant under the very same HTSUS heading language, chapter notes, and Explanatory Notes that Defendant now tries to downplay.

Next, expertise is not at issue. *See Mattel, Inc.*, 346 F. Supp. 2d at 1311 ("It is axiomatic that Customs has 'specialized experience' in the classification of goods."). To the extent there is any deviation in HRL H325604 from prior rulings, CBP provided a detailed explanation as to why similar products are sometimes classified under heading 2309 versus heading 2941. (*See* Ex. 9, HRL H325604 (Aug. 31, 2023) at 11 ("In distinguishing between products which were classifiable as an animal feed preparation or premix of heading 2309, HTSUS, from those products which are classifiable as an antibiotic of heading 2941, HTSUS, CBP has not always viewed the preclusion stated in EN 23.09 of products containing 'higher concentration of active substances' (antibiotics) as being determinative.").) Thus, CBP took care to ensure that its classification accounted for prior precedent and the agency's historical practice of taking a nuanced and thoughtful approach to the classification requirements under these two competing headings.

Defendant's assertion that the ruling was based on only a "limited set of facts," and therefore "should not be considered persuasive," is itself an unpersuasive argument. (*See* Def.'s Cross-Mot. at 45.) CBP specifies the information that it requires an importer to submit in making

a ruling request, including "a complete statement of all relevant facts." 19 C.F.R. § 177.2(b) (further requiring that the request "must be described in sufficient detail to permit the proper application of relevant customs and related laws").[35] If the request includes insufficient detail, CBP can ask for additional information, including product samples, technical specifications, photos or drawings, chemical analyses, and related documents. There is nothing in HRL H325604 to suggest that CBP did not have "a complete statement of all relevant facts" when it reviewed the Pharmgate CTC concentrate product at issue. Instead, we assert that the issuance of HRL H325604 itself is indicative that Pharmgate's ruling request complied with the applicable regulations in 19 C.F.R. Part 177 and CBP did have all the relevant information concerning the Pharmgate CTC concentrate product.

Defendant does not identify what new facts it has discovered that support its now different conclusion on the classification of CTC concentrate products and this appears to be because there are none. Considering that Defendant does not deny the thoroughness of the legal issues reviewed in HRL H325604, and was aware of all the pertinent facts concerning CTC concentrate products, we submit the holding in HRL H325604 should be considered persuasive in this litigation concerning "essentially the same product."

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Cross-Motion for Summary Judgment and grant Plaintiff's Motion for Summary Judgement in its entirety.

Respectfully submitted:

**FAEGRE DRINKER BIDDLE & REATH LLP**
Attorneys for Plaintiff
Zoetis Services LLC
320 S. Canal Street
Suite 3300

---

[35] *See also* https://www.cbp.gov/trade/rulings/eruling-requirements (last accessed Aug. 11, 2025).

Chicago, IL 60606
Telephone (312) 569-1000

By:    <u>/s/ Wm. Randolph Rucker</u>

Dated: September 19, 2025          Wm. Randolph Rucker

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JOSEPH A. LAROSKI, JR.,** *JUDGE*

| | | |
|---|---|---|
| ZOETIS SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Court No.  22-00056 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S CERTIFICATION OF COMPLIANCE**

I, Wm. Randolph Rucker, counsel for Plaintiff Zoetis Services LLC, certify that the foregoing brief complies with the type-volume limitation set forth in the *Standard Chambers Procedures* and USCIT Rules 56 and 81. Specifically, this brief contains [14,000] words (excluding the parts of the brief exempted by *Standard Chambers Procedures* 2(B)) as determined by the word count feature of the word processing program used to create this brief. I further certify that the foregoing brief complies with the typeface requirements set forth in USCIT Rule 81. Specifically, this brief has been prepared using a proportionately spaced typeface using Microsoft Word 2007, in 12-point Times New Roman font.

FAEGRE DRINKER BIDDLE & REATH LLP
Attorneys for Plaintiff
Zoetis Services LLC
320 S. Canal Street, Suite 3300
Chicago, IL 60606
Telephone (312) 569-1000

By:    /s/ Wm. Randolph Rucker
Dated: September 19, 2025          Wm. Randolph Rucker

## CERTIFICATE OF SERVICE

Wm. Randolph Rucker certifies that he is an attorney with the law firm of Faegre Drinker

Biddle & Reath LLP, with offices located at 320 S. Canal Street, Suite 3300, Chicago, Illinois

60606, and that on September 19, 2025 on behalf of the Plaintiff herein, he served the attached

Motion for Summary Judgment on:

> Luke Mathers
> U.S. Department of Justice
> Commercial Litigation Branch, Civil Division
> 26 Federal Plaza
> Suite 346
> New York, NY 10278
> Email: luke.mathers@usdoj.gov

the attorney for the Defendant herein, by electronic service in the CM/ECF System of the Court

of International Trade.

/s/ Wm. Randolph Rucker

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. JOSEPH A. LAROSKI, JR.,** *JUDGE*

| | |
|---|---|
| ZOETIS SERVICES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Court No. 22-00056 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

**TABLE OF CONTENTS FOR EXHIBITS**

| Exhibit | Full Citation | Abbreviated Citation | Confidential |
|---|---|---|---|
| 32 | CTC Concentrate Packaging Label | N/A | No |
| 33 | WCO Compendium Decisions for heading 2309 (from 2025) | N/A | No |
| 34 | WCO Compendium Decisions for subheading 3003.20 | N/A | No |
| 35 | HRL 967895 (March 16, 2006) | N/A | No |
| 36 | Revised ENs for heading 3003 (from 2025) | N/A | No |
| 37 | Reasoning for WCO Compendium Decision for Heading 3003 | N/A | No |
| 38 | Aureomycin 90 Label | N/A | No |
| 39 | Aureomycin 100 Granular Label | N/A | No |
| 40 | Aureomycin 40-40 Label | N/A | No |
| 41 | Aureos 700 Label | N/A | No |
| 42 | ChlorMax Label | N/A | No |